# CANADA SOUTHERN RAILWAY COMPANY *v.* GEBHARD and Another, Executors.

## SAME *v.* GEBHARD.

## SAME *v.* SAME.

## SAME *v.* GEBHARD and Another, Executors.

ALL: IN ERROR TO THE CIRCUIT COURT OF THE UNITED STATES FOR THE SOUTHERN DISTRICT OF NEW YORK.

Argued October 24th, 1883.—Decided December 10th, 1883.

*Bankruptcy—Conflict of Laws—Constitutional Law—Contracts—Corporations—Dominion of Canada—Statutes (Foreign).*

1. The Parliament of Canada has authority to grant to an embarrassed railway corporation within the Dominion power to make an arrangement with its mortgage creditors for the substitution of a new security in the place of the one they hold, and to provide that the arrangement shall be binding on all the holders of obligations secured by the same mortgage when it shall have received the assent of the majority, provision being made for the protection of the minority in the enjoyment of rights and privileges in the new security identical with those of the majority.

2. When the Parliament of the Dominion of Canada authorizes a corporation, existing under its authority, to enforce upon its mortgage creditors a settlement by which they are to receive other securities of the corporation in place of their mortgage bonds, and the scheme is assented to by a large majority of bondholders, and goes into effect, and the right of citizens of the United States who are bondholders to participate in the reorganization on the same terms as Canadians or other British subjects is preserved and recognized, the settlement is binding upon bondholders who are citizens of the United States, and who sue in courts of the United States to recover on their bonds.

3. A corporation dwells in the place of its creation, but may do business wherever its charter allows and local laws do not forbid. A corporation of one country, doing business in another country, is subject to such control, in respect to its powers and obligations, as the government which created it may properly exercise. Every person who deals with it anywhere impliedly subjects himself to such laws of its own country affecting its power and obligations as the known and established policy of that government authorizes. Anything done in that country under the authority of such law, which discharges it from liability there, discharges it everywhere.

As individual holders of mortgage bonds issued by a railroad corporation, and secured by the same mortgage, have mutual contract interests and relations, there is nothing inequitable, when the power exists, in subjecting a small minority to the will of a decided majority, in reorganizing the mortgage indebtedness when the corporation is embarrassed. *Semble,* That if this were done by virtue of a statute of the United States, enacted under the provision of the Constitution conferring power to establish uniform laws on the subject of bankruptcy, it would not be regarded as impairing the obligation of a contract.

Suits (commenced in the Supreme Court of the State of New York and removed to the Circuit Court of the United States for the Southern District of New York), by holders of mortgage bonds of the Canada Southern Railway Company, and of extension bonds, to recover on their extension bonds and on the interest coupons on their mortgage bonds. The following are the facts as stated by the court:

What is now known as the Canada Southern Railway Company was originally incorporated on the 28th of February, 1868, by the legislature of the Province of Ontario, Canada, to build and operate a railroad in that province between the Detroit and Niagara rivers, and was given power to borrow money in the province or elsewhere and issue negotiable coupon bonds therefor, secured by a mortgage on its property, "for completing, maintaining, and working the railway." Under this authority the company, on the 2d of January, 1871, at Fort Erie, Canada, made and issued a series of negotiable bonds, falling due in the year 1906, amounting in all to $8,703,000, with coupons for semi-annual interest attached, payable, principal and interest, at the Union Trust Company, in the City of New York. To secure the payment of both principal and interest as they matured, a trust mortgage was executed by the com-

pany covering " the railway of said company, its lands, tolls, revenues present and future, property and effects, franchises and appurtenances." Every bond showed on its face that it was of this kind and thus secured.

Before the 31st of December, 1873, the company became satisfied that it would be unable to meet the interest on these bonds maturing in the coming January, and so it requested the holders to fund their coupons falling due January 1st, 1874, July 1st, 1874, and January 1st, 1875, by converting them into new bonds payable on the 1st of January, 1877, and by so doing only, in legal effect, extend the time for the payment of the interest, without destroying the lien of the coupons under the mortgage, or otherwise affecting the obligation of the old bonds. Some of the bondholders funded their coupons, in accordance with this proposition, and accepted the extension bonds, but, under the arrangement, their coupons were not to be cancelled until the new bonds were paid.

In this condition of affairs the Parliament of Canada, on the 26th of May, 1874, enacted that the Canada Southern Railway, which was the railway built by the Canada Southern Railway Company under its provincial act of incorporation, " be declared to be a work for the general advantage of Canada," and a " body corporate and politic within the jurisdiction of Canada," for all the purposes mentioned in, and with all the franchises conferred by, the several incorporating acts of the legislature of the province. This, under the provisions of the British North America act, 1867, passed by the Parliament of Great Britain " for the Union of Canada, Nova Scotia, and New Brunswick, and the Government thereof," made the corporation a Dominion corporation, and subjected it to the legislative authority of the Parliament of Canada.

On the 15th of March, 1875, another series of bonds, amounting in the aggregate to $2,044,000, or thereabouts, was issued and secured by a second mortgage to trustees. After the issue of all the bonds the company found itself unable to pay its interest and otherwise financially embarrassed, and a joint committee, composed of three directors and three bondholders, after full consideration of all the circumstances, submitted to

the company and to the bondholders "a scheme of arrangement of the affairs of the company," which was approved at a meeting of the directors on the 28th of September, 1877. This scheme contemplated the issue of $14,000,000 of thirty-year bonds, bearing three per cent. interest for three years and five per cent. thereafter, guaranteed, as to interest, for twenty years, by the New York Central and Hudson River Railroad Company, the first coupons being payable January 1st, 1878. These new bonds were to be secured by a first mortgage on the property of the company, and exchanged for old bonds at certain specified rates. The old bonds of 1871 were to be exchanged for new at the rate of one dollar of principal of the old for one dollar of the new, nothing being given either for the past due coupons or the extension bonds executed under the arrangement in December, 1873. The proposed issue of bonds was large enough to take up all the old indebtedness at the rates proposed, whether bonded or otherwise, and leave a surplus, to be used for acquiring further equipment, and for such other purposes of the company as the directors might find necessary. This scheme was formally assented to by the holders of 108,132 shares of the capital stock out of 150,000; by the holders of the bonds of 1871 to the amount of $7,332,000 out of $8,703,000; and by the holders of $1,590,000 of the second series of bonds out of $2,029,000 then outstanding. Upon the representation of these facts to the Parliament of Canada, the "Canada Southern Arrangement Act, 1878," was passed and assented to in the Queen's name on the 16th of April, 1878.

This statute, after reciting the scheme of arrangement, with the causes that led to it, and that it had been assented to by the holders of more than two-thirds of the shares of the capital stock of the company, and by the holders of more than three-fourths of the two classes of bonds, enacted that the scheme be authorized and approved; that the new bonds be a first charge "over all the undertaking, railway works, rolling stock and other plant" of the company, and that the new bonds be used for the purposes contemplated by the arrangement, including the payment of the floating debt. Section 4 was as follows:

"4. The scheme, subject to the conditions and provisos in this act contained, shall be deemed to have been assented to by all the holders of the original first mortgage bonds of the company secured by the said recited indenture of the fifteenth day of December, one thousand eight hundred and seventy, and of all coupons and bonds for interest thereon, and also, by all the holders of the second mortgage bonds of the company secured by the said recited indenture of the fifteenth day of March, one thousand eight hundred and seventy-five, and of all coupons thereon, and also by all the shareholders of the Canada Southern Railway Company, and the hereinbefore recited arrangement shall be binding upon all the said holders of the first and second mortgage bonds and coupons, and bonds for interest thereon respectively, and upon all the shareholders of the company."

Under the arrangement thus authorized the New York Central and Hudson River Railroad Company executed the proposed guaranty, and the scheme was otherwise carried into effect.

The several defendants in error were, and always had been, citizens of the State of New York, and were, at the time the scheme of arrangement was entered into and confirmed by the Parliament of Canada, the holders and owners of certain of the bonds of 1871, and of certain extension bonds, these last having been delivered to them respectively at the Union Trust Company in the city of New York, where the exchanges were made, in December, 1873. Neither of the defendants in error assented in fact to the scheme of arrangement, and they did not take part in the appointment of the joint committee. Their extension bonds have never been paid, neither have the coupons on their bonds of 1871, which fell due on the 1st of July, 1875, and since, though demanded. The company has been at all times ready and willing to issue and deliver to them the full number of new bonds, with the guaranty of the New York Central and Hudson River Railroad Company attached, that they would be entitled to receive under the scheme of arrangement.

These suits were brought on the extension bonds and past due coupons. The company pleaded the scheme of arrangement as a defence, and at the trial tendered the new bonds in ex-

change for the old. The circuit court decided that the arrangement was not a bar to the actions, and gave judgments in each of them against the company for the full amount of extension bonds and coupons sued for. To reverse these judgments the present writs of error were brought.

Mr. Joseph H. Choate for the plaintiff in error.

Mr. John M. Bowers for the defendant in error.

Mr. Chief Justice Waite delivered the opinion of the court. After reciting the foregoing facts, he said:

Two questions are presented for our consideration:

1. Whether the "Arrangement Act" is valid in Canada, and had the effect of binding non-assenting bondholders within the Dominion by the terms of the scheme; and,

2. Whether, if it did have that effect in Canada, the courts of the United States should give it the same effect as against citizens of the United States whose rights accrued before its passage.

1. There is no constitutional prohibition in Canada against the passage of laws impairing the obligation of contracts, and the Parliament of the Dominion had, in 1878, exclusive legislative authority over the corporation and the general subjects of bankruptcy and insolvency in that jurisdiction. As to all matters within its authority, the Dominion Parliament has "plenary legislative powers as large and of the same nature as those of the imperial parliament." The City of Fredericton v. The Queen, 3 Canada Supreme Court, 505.

On the 20th of August, 1867, the Parliament of Great Britain passed the "Railway Companies Act, 1867." 2 Stat. 1332; 30, 31 Vict., c. 127. This act provides, among other things, for the preparation of "schemes of arrangement" between railway companies unable to meet their engagements and their creditors, which can be filed in the court of chancery, accompanied by a declaration in writing, under the seal of the company, and verified by the oaths of the directors, to the effect that the company is unable to meet its engagements with its creditors. Notice of the filing of such a scheme must be pub-

lished in the Gazette, and the scheme is to be deemed assented to by the holders of mortgages, bonds, debenture stock, rent charges, and preference shares, when assented to in writing by the holders of three-fourths in value of each class of security, and by the ordinary shareholders when assented to at an extraordinary general meeting, specially called for that purpose. Provision is then made for an application to the court by the company for a confirmation of the scheme. Notice of this application must be published in the Gazette, and, after hearing, the court, if satisfied that no sufficient objection to the scheme has been established, may confirm it. Sec. 18 is as follows:

"The scheme when confirmed shall be enrolled in the court, and thenceforth the same shall be binding and effectual to all intents, and the provisions thereof shall, against and in favor of the company and all parties assenting thereto or bound thereby, have the like effect as if they had been enacted by parliament."

This act, it is apparent, was not passed to provide, for the first time, a way in which insolvent and embarrassed railway companies might settle and adjust their affairs, but to authorize the court of chancery to do what had before been done by parliament. Lord Cairns, L. J., said of it in *Cambrian Railways Company's Scheme*, L. R. 3 Ch. at page 294:

"Hitherto such companies, if they desired to raise further capital to meet their engagements, have been forced to go to parliament for a special act, enabling them to offer such advantages by way of preference or priority to persons furnishing new capital as would lead to its being obtained. And parliament, in dealing with such applications, has been in the habit of considering how far the arrangements proposed as to such new capital were assented to or dissented from by those who might be considered as the proprietors of the existing capital of the company, either as shareholders or bondholders. The object of the present act . . . appears to be to dispense with a special application to parliament of the kind I have described, and to give a parliamentary sanction to a scheme filed in the court of chancery, and confirmed by the court, and assented to by certain majorities of shareholders and of holders of debentures and securities *ejusdem generis*."

And even now in England special acts are passed whenever the provisions of the general act are not such as are needed to meet the wants of a particular company. A special act of this kind was considered in *London Financial Association* v. *Wrexham, Mold and Connah's Quay Railway Company*, L. R. 18 Eq. 566.

In Canada no general statute like that in England has been enacted, but the old English practice of passing a special act in each particular case prevails, and Osler, J., said in *Jones* v. *Canada Central Railway Company*, 46 Up. Can. Q. B. 250, "our statute books are full" of legislation of the kind. The particular question in that case was whether, after the establishment of the Dominion government the provincial parliaments had authority to pass laws with reference to provincial corporations which would operate upon debentures payable in England, and held by persons residing there, but it was not suggested, either by the court or counsel, that a statute of the kind, passed by the Dominion Parliament in reference to a Dominion corporation, would not be valid as a law. So far as we are advised, the parliamentary authority for such legislation has never been doubted either in England or Canada. Many cases are reported in which such statutes were under consideration, but in no one of them has it been intimated that the power was even questionable.

In *Gilfillan* v. *Union Canal Company*, *ante*, it was said that holders of bonds and other obligations issued by large corporations for sale in market and secured by mortgages to trustees, or otherwise, have, by fair implication, certain contract relations with each other. In England, we infer from what was said by Lord Cairns in *Cambrian Railways Company's Scheme*, *supra*, they are considered as in a sense part proprietors of the existing capital of the company, and dealt with by parliament and the courts accordingly. They are not there, any more than here, corporators, and thus necessarily, in the absence of fraud or undue influence, bound by the will of the majority as to matters within the scope of the corporate powers, but they are interested in the administration of a trust which has been created for their common benefit. Ordinarily the

ultimate security depends in a large degree on the success of the work in which the corporation is engaged, and it is not uncommon for differences of opinion to exist as to what ought to be done for the promotion of their mutual interests. In the absence of statutory authority or some provision in the instrument which establishes the trust, nothing can be done by a majority, however large, which will bind a minority without their consent. Hence it seems to be eminently proper that where the legislative power exists some statutory provision should be made for binding the minority in a reasonable way by the will of the majority; and unless, as is the case in the States of the United States, the passage of laws impairing the obligation of contracts is forbidden, we see no good reason why such provision may not be made in respect to existing as well as prospective obligations. The nature of securities of this class is such that the right of legislative supervision for the good of all, unless restrained by some constitutional prohibition, seems almost necessarily to form one of their ingredients, and when insolvency is threatened, and the interests of the public, as well as creditors, are imperilled by the financial embarrassments of the corporation, a reasonable " scheme of arrangement " may, in our opinion, as well be legalized as an ordinary " composition in bankruptcy." In fact, such " arrangement acts " are a species of bankrupt acts. Their object is to enable corporations created for the good of the public to relieve themselves from financial embarrassments by appropriating their property to the settlement and adjustment of their affairs, so that they may accomplish the purposes for which they were incorporated. The necessity for such legislation is clearly shown in the preamble to the Grand Trunk Arrangement Act, 1862, passed by the Parliament of the Province of Canada on the 9th of June, 1862, before the establishment of the Dominion government, and which is in these words:

"Whereas the interest on all the bonds of the Grand Trunk Railway Company of Canada is in arrear, as well as the rent of the railways leased to it, and the company has also become indebted, both in Canada and in England, on simple contract, to

various persons and corporations, and several of the creditors have obtained judgment against it, and much litigation is now pending ; and whereas the keeping open of the railway traffic, which is of the utmost importance to the interests of the province, is thereby imperilled, and the terms of a compromise have been provisionally settled between the different classes of creditors and the company, but in order to facilitate and give effect to such compromise the interference of the legislature of the province is necessary."

The confirmation and legalization of " a scheme of arrangement" under such circumstances is no more than is done in bankruptcy when a "composition" agreement with the bankrupt debtor, if assented to by the required majority of creditors, is made binding on the non-assenting minority.  In no just sense do such governmental regulations deprive a person of his property without due process of law.  They simply require each individual to so conduct himself for the general good as not unnecessarily to injure another.  Bankrupt laws have been in force in England for more than three centuries, and they had their origin in the Roman law.  The Constitution expressly empowers the Congress of the United States to establish such laws.  Every member of a political community must necessarily part with some of the rights which, as an individual, not affected by his relation to others, he might have retained.  Such concessions make up the consideration he gives for the obligation of the body politic to protect him in life, liberty, and property.  Bankrupt laws, whatever may be the form they assume, are of that character.

2. That the laws of a country have no extra-territorial force is an axiom of international jurisprudence, but things done in one country under the authority of law may be of binding effect in another country.  The obligor of the bonds and coupons here sued on was a corporation created for a public purpose, that is to say, to build, maintain, and work a railway in Canada.  It had its corporate home in Canada, and was subject to the exclusive legislative authority of the Dominion parliament.  It had no power to borrow money or incur debts except for completing, maintaining, and working its railway.

The bonds taken by the defendants in error showed on their face that they were part of a series amounting in the aggregate to a very large sum of money, and that they were secured by a trust mortgage on the railway of the company, its lands, tolls, revenues, &c.   In this way the defendants in error, when they bought their bonds, were, in legal effect, informed that they were entering into contract relations not only with a foreign corporation created for a public purpose, and carrying on its business within a foreign jurisdiction, but with the holders of other bonds of the same series, who were relying equally with themselves for their ultimate security on a mortgage of property devoted to a public use, situated entirely within the territory of a foreign government.

A corporation "must dwell in the place of its creation, and cannot migrate to another sovereignty" (*Bank of Augusta* v. *Earle,* 13 Pet. 588), though it may do business in all places where its charter allows and the local laws do not forbid. *Railroad* v. *Koontz,* 104 U. S. 12.   But wherever it goes for business it carries its charter, as that is the law of its existence (*Relf* v. *Rundel,* 103 U. S. 226), and the charter is the same abroad that it is at home.   Whatever disabilities are placed upon the corporation at home it retains abroad, and whatever legislative control it is subjected to at home must be recognized and submitted to by those who deal with it elsewhere. A corporation of one country may be excluded from business in another country (*Paul* v. *Virginia,* 8 Wall. 168), but, if admitted, it must, in the absence of legislation equivalent to making it a corporation of the latter country, be taken, both by the government and those who deal with it, as a creature of the law of its own country, and subject to all the legislative control and direction that may be properly exercised over it at the place of its creation.   Such being the law, it follows that every person who deals with a foreign corporation impliedly subjects himself to such laws of the foreign government, affecting the powers and obligations of the corporation with which he voluntarily contracts, as the known and established policy of that government authorizes.   To all intents and purposes, he submits his contract with the corporation to

such a policy of the foreign government, and whatever is done by that government in furtherance of that policy which binds those in like situation with himself, who are subjects of the government, in respect to the operation and effect of their contracts with the corporation, will necessarily bind him. He is conclusively presumed to have contracted with a view to such laws of that government, because the corporation must of necessity be controlled by them, and it has no power to contract with a view to any other laws with which they are not in entire harmony. It follows, therefore, that anything done at the legal home of the corporation, under the authority of such laws, which discharges it from liability there, discharges it everywhere.

No better illustration of the propriety of this rule can be found than in the facts of the present case. This corporation was created in Canada to build and work a railway in that Dominion. Its principal business was to be done in Canada, and the bulk of its corporate property was permanently fixed there. All its powers to contract were derived from the Canadian government, and all the contracts it could make were such as related directly or indirectly to its business in Canada. That business affected the public interests, and the keeping of the railway open for traffic was of the utmost importance to the people of the Dominion. The corporation had become financially embarrassed, and was, and had been for a long time, unable to meet its engagements in the ordinary way as they matured. There was an urgent necessity that something be done for the settlement of its affairs. In this the public, the creditors and shareholders were all interested. A large majority of the creditors and shareholders had agreed on a plan of adjustment which would enable the company to go on with its business, and thus accommodate the public, and to protect the creditors to the full extent of the available value of its corporate property. The Dominion parliament had the legislative power to legalize the plan of adjustment as it had been agreed on by the majority of those interested, and to bind the resident minority creditors by its terms. This power was known and recognized throughout the Dominion when

the corporation was created, and when all its bonds were executed and put on the market and sold. It is in accordance with and part of the policy of the English and Canadian governments in dealing with embarrassed and insolvent railway companies and in providing for their reorganization in the interest of all concerned. It takes the place in England and Canada of foreclosure sales in the United States, which in general accomplish substantially the same result with more expense and greater delay; for it rarely happens in the United States that foreclosures of railway mortgages are anything else than the machinery by which arrangements between the creditors and other parties in interest are carried into effect, and a reorganization of the affairs of the corporation under a new name brought about. It is in entire harmony with the spirit of bankrupt laws, the binding force of which, upon those who are subject to the jurisdiction, is recognized by all civilized nations. It is not in conflict with the Constitution of the United States, which, although prohibiting States from passing laws impairing the obligation of contracts, allows Congress " to establish . . uniform laws on the subject of bankruptcy throughout the United States." Unless all parties in interest, wherever they reside, can be bound by the arrangement which it is sought to have legalized the scheme may fail. All home creditors can be bound. What is needed is to bind those who are abroad. Under these circumstances the true spirit of international comity requires that schemes of this character, legalized at home, should be recognized in other countries. The fact that the bonds made in Canada were payable in New York is unimportant, except in determining by what law the parties intended their contract should be governed; and every citizen of a country, other than that in which the corporation is located, may protect himself against all unjust legislation of the foreign government by refusing to deal with its corporations

On the whole, we are satisfied that the scheme of arrangement bound the defendants in error, and that these actions cannot be maintained. The same result was reached by the Court of Queen's Bench in the Province of Ontario, when pass-

ing on a similar statute in *Jones* v. *The Canada Central Railway Company, supra.*

*The judgments are reversed and the causes remanded, with instructions to enter judgment on the facts found in favor of the railway company in each of the cases.*

MR. JUSTICE HARLAN, dissenting.—The Canada Southern Railway Company is a corporation created and organized under the laws of the Dominion of Canada. It was given, by its charter, power to borrow in Canada " or elsewhere," at a rate of interest not exceeding eight per cent. per annum, such sums of money as might be necessary to complete, maintain, or work its railway; to issue bonds therefor, payable either in currency or in sterling, at such place, within Canada " or without," as might be deemed advisable; to sell the same at such prices or discount as might be deemed expedient or necessary; and to hypothecate, mortgage, or pledge the lands, tolls, revenues, and other property of the company for the payment of the said sums and the interest thereon.

In pursuance of the authority thus conferred, the company, in 1871, issued its bonds in the customary form of negotiable securities, and made them payable in the year 1906, at the office of the Union Trust Company in the city of New York, with interest at the rate of seven per cent. per annum, coupons being given for such interest. These bonds, with their interest, were secured by a deed of trust to Wm. L. Scott and Kenyon Cox, citizens of the United States, conveying to them and their successors in the trust, the railway of the company, its lands, tolls, revenues present and future, property, effects, franchises, and appurtenances. That deed declared that the bonds, and also the rights and benefits arising therefrom, should pass by delivery.

In 1873 the company issued certain bonds, of the denomination of $105 each, for the purpose of funding unpaid coupons. They were made payable, principal and interest, in gold, at the office of the Union Trust Company in the city of New York. In order to effect this arrangement for funding, the latter company was made a trustee to deliver the bonds of $105 each to

the parties surrendering the unpaid coupons.   Of some of these bonds defendants in error, who are citizens of New York, became the holders.   They were delivered to them at the city of New York.   Upon their non-payment at maturity, the present suits at law were brought in one of the courts of that State, and judgment asked for the amount of the bonds.   The railway company appeared, and upon its petition the suits were removed into the Circuit Court of the United States for the Southern District of New York.   In the latter court an answer was filed, to which the plaintiff demurred.   The demurrer being sustained and the company declining to answer further, judgment was rendered for the amount due on the bonds in suit.

What is the defence which my brethren have declared to be sufficient to deprive the plaintiffs of their right to judgment? That the company had paid the bonds in suit, in whole or in part?   No.   That, by the terms of the contract, it was discharged from liability to pay them?   By no means.   Its defence is placed wholly upon an act of the Parliament of Canada ratifying a certain scheme or arrangement, which is inconsistent with the contract between the parties, and to which a large minority of the bondholders and stockholders have never given their assent.   That scheme provided for the surrender of the old bonds, bearing seven per cent. interest and the substitution of other bonds, maturing at a later date, and bearing a less rate of interest—three per cent. for the first three years, and five per cent. thereafter, the interest on the new bonds being guaranteed by the New York and Hudson River Railroad Company.

To this scheme the circuit court finds as a fact that the plaintiffs never assented.   They stood, as they had the right to do, upon their contract with the company.   But the Parliament of Canada declares that this scheme " *shall* be *deemed* to have been assented to by *all* the holders of the original first mortgage bonds of the company," and that this arrangement " *shall* be *binding* upon *all* the holders of the first and second mortgage bonds and coupons and bonds for interest thereon respectively, and upon all the shareholders of the company."

This defence, asserting the power of a foreign government, by its legislation, to destroy the contract rights of citizens of the United States, was well characterized, as it seems to me, by the learned circuit judge who tried this case, as a most extraordinary one to be made in a country where the obligation of contracts against impairment· by legislative enactment, as well as the·rights of persons and property, are carefully guarded by constitutional provisions. In this country, no State can pass any law impairing the obligation of contracts; the Constitution of the United States forbids such legislation. And the principle is founded in justice, independently of this constitutional provision. The statute of Canada here relied on disregards this principle, and openly and in terms impairs the obligation of the contract which each holder of these bonds has with this foreign railway company. It assumes, without a hearing and without the consent of those who hold its bonds, to discharge the railway company from all liability thereon. If any State in this Union should assume to pass a law with reference to a railway corporation she had created, requiring the holders of its bonds, for which they had paid value, to surrender them and take in their place others of less value, and payable at a different time, our courts, federal and State, would be constrained, by their obligation to support the Constitution of the United States, to declare such legislation to be in conflict with that instrument. More than that, a citizen of Canada, or even a railway corporation of that Dominion, could have the benefit, in our courts, of the constitutional inhibition upon State laws impairing the obligation of contracts.

In the *Sinking Fund Cases*, 99 U. S. 718, 719, we said that while the United States are not included within the constitutional prohibition which prevents States from passing laws impairing the obligation of contracts, yet " equally with the States they are prohibited from depriving persons or corporations of property without due process of law. They cannot legislate back to themselves, without making compensation, the lands they have given this corporation to aid in the construction of its railroad. Neither can they by legislation compel the corporation to discharge its obligations in respect to the subsidy bonds·

otherwise than according to the laws of the contract already made in that connection. The United States are as much bound by their contracts as are individuals. If they repudiate their obligations, it is as much repudiation, with all the wrong and reproach that term implies, as it would be if the repudiator had been a State, or a municipality, or a citizen. No change can be made in the title created by the grant of the lands, or in the contract for the subsidy bonds, without the consent of the corporation."

But the laws of Canada, by the judgment now rendered, are given effect here, to the injury of our own citizens, notwithstanding those laws arbitrarily deprive them of their contract rights. This railroad company, under express authority conferred by its charter, executed bonds payable, as we have seen, in New York, and secured them by mortgage executed to citizens of the United States. It sent them to this country for sale and our people invested their money in them. Intrenched behind the arbitrary edict of a foreign government, it now says to American holders of its bonds, that it will not comply with its contract—that if they do not surrender those securities and take others of less value, they shall not receive anything.

It is claimed by my brethren that the Canada statute provides a scheme which, in its practical effect, resembles a composition in bankruptcy. It seems to me that there are several answers to this suggestion: 1. It does not purport to be a scheme of bankruptcy in the sense of the word bankruptcy as used either in England or America. 2. It is unlike a composition in bankruptcy in this: that whereas a composition is never had except upon notice, so that creditors may have their day in court, with opportunity to show that the proposed composition should not be made, here no such opportunity was given to the holders of this company's bonds, in any court or other tribunal, to show that the arrangement which the Canadian parliament sanctioned ought not, in justice, to be made; but the arrangement was, by legislative enactment, made absolutely binding upon every bondholder and stockholder, even those who are citizens of other countries.

It is said that the Canadian scheme is practically nothing

more than might be accomplished in foreclosure proceedings instituted in one of our own courts by or at the instance of the assenting bondholders. My answer is, that all bondholders and stockholders have their day in court, in such proceedings ; and, when upon the judicial sale of a railway and its appurtenances, they fail to realize the full amount of their claims, they are not deprived of their property without due process of law.

Reference is made by the court to the act of the English parliament which authorizes such arrangements to be effected through courts of chancery. But, in such proceedings, all interested have their day in court, with opportunity to show that the proposed scheme should not receive judicial sanction.

In my judgment, the discharge in Canada, by statute, of this foreign railway company from all obligation to pay these bonds according to their terms—whatever may be the binding force of such legislation upon persons resident in that country, or upon those who may assert their rights under the original contract in the courts of Canada—can have no extra-territorial effect ; certainly none as to persons who reside in a different State or country, where the contract is to be performed, and in the courts of which it becomes the subject of litigation.

In *Baldwin* v. *Hale*, 1 Wall. 223, it was held that a discharge obtained under the insolvent law of one State of the Union is not a bar to an action on a note even when given in and payable in the same State, the party to whom the note was given having been and being of a different State. Story, in his Conflict of Laws, says that should a State provide that the discharge of an insolvent debtor under her own laws was a discharge of all his contracts, even of those made in a foreign country, such a discharge, although binding upon the courts of that State, would or might be mere nullities in other countries. § 348. Chancellor Kent, referring to State insolvent laws, in operation when there is no national bankrupt statute, says :

" The discharge under a State law is no bar to a suit on a contract existing when the law was passed, nor to an action by a citizen of another State in the courts of the United States, or of any other State than that where the discharge was obtained. The

discharge under a State law will not discharge a debt due to a citizen of another State who does not make himself a party to a proceeding under the law. It will only operate upon contracts made within the State between its own citizens or suitors, subject to State power. The doctrine of the Supreme Court of the United States in *Ogden* v. *Saunders* is, that a discharge under the bankrupt law of one country does not affect contracts made or to be executed in another." 2 Kent, p. 392–3.

Such is the unvarying current of authority in this country. If a discharge by an insolvent law of one of the United States does not affect the contract rights of citizens of another State, how much stronger is the case where, by the terms of the contract, it is to be performed in a State or country other than that in which the discharge is granted. My brethren suggest, if I do not misapprehend their opinion, that the parties here suing must be understood to have purchased these bonds with reference to the power which the Canadian government has over corporations of its own creation. But this view, it seems to me, overlooks the principle, founded, says Story, in natural justice—and applicable here even if the bonds in suit had been purchased and delivered in Canada—that "where the contract is, either expressly or tacitly, to be performed in another place than where made, the rule is, in conformity with the presumed intention of the parties, that the contract, as to its validity, nature, obligation, and interpretation, is to be governed by the law of the place of performance." Story, Conflict of Laws, § 280; *Andrews* v. *Pond*, 13 Pet. 65; *Cook* v. *Moffatt*, 5 How. 307. Why should it not be presumed that the parties to these contracts made them with reference as well to that principle as to another principle which is thus forcibly stated by Kent?

"The laws of other governments have no force beyond their territorial limits; and if permitted to operate in other States, it is upon a principle of comity, and only when neither the State nor its citizens would suffer any inconvenience from the application of the foreign law." 2 Kent, 406.

Story announces the same doctrine in the following language:

".And even in relation to a discharge according to the laws of the place where the contract is made, there are (as we have seen) some necessary limitations and exceptions ingrafted upon the general doctrine which every country will enforce, whenever those laws are manifestly unjust, or are injurious to the fair rights of its own citizens. It has been said by a learned judge with great force : 'As the laws of foreign countries are not admitted *ex proprio vigore*, but merely *ex comitate*, the judicial power will exercise a discretion with respect to the laws which they may be called upon to sanction ; for should they be manifestly unjust, or calculated to injure their own citizens, they ought to be rejected. Thus, if any State should enact that its citizens should be discharged from all debts due to creditors living without the State, such a provision would be so contrary to th . common principles of justice that the most liberal spirit of comity would not require its adoption in any other State.' "

In Burgess' Commentaries on Colonial and Foreign Laws, vol. 1, p. 5, the author says :

"It is established as a principle of international jurisprudence that effect should be given to the laws of another State whenever the rights of a litigant before its tribunals are derived from, or are dependent on, those laws, and when such recognition is not prejudicial to its own interests or the rights of its own subjects."

The same view is thus expressed by another American author :

"It [the State] must consult sound morals and the interests and public policy of its own people, and if to enforce the laws of another State or country would lead to their infringement, it would be treacherous to its own duties to lend aid to their execution." 1 Daniel on Negotiable Instruments, § 866.

In *Smith* v. *Buchanan*, 1 East, 6, 11, the question was whether a discharge of an English contract under an insolvent act of the State of Maryland, where the debtor resided, was a bar to a suit upon that contract in the courts of England. The point was there made that the discharge under the laws of Maryland was analogous and equivalent to a certificate of bank-

ruptcy in England; and having been issued by a competent jurisdiction in the case of subjects of Maryland residing there at the time, though it had not the binding force of law in England, yet the courts there should give effect to it "by adoption and courtesy of nations." But to that argument the court, speaking by Lord Kenyon, said:

"This is the case of a contract lawfully made by a subject in this country, which he resorts to a court of justice to enforce; and the only answer is that a law has been made in a foreign country to discharge these defendants from their debts on condition of their having relinquished all their property to their creditors." "But how," said he, "is that an answer to a subject of this country, suing on a lawful contract made here? How can it be pretended he is bound by a condition to which he has given no assent either express or implied?" "In America," adds Story, referring to that case, "the same doctrine has obtained the fullest sanction." Story on Conflict of Laws, § 342.

So also in *Bartley* v. *Hodges*, 1 Best & Smith, 375, where the defendant pleaded, in a court of England, an insolvent discharge under the laws of Victoria, a British colony. The court said:

"No case has been cited to show that a discharge under the insolvent laws of Victoria is an answer to an action here, brought by an English subject on a bill of exchange drawn and payable in England. . . . It is true that the colony of Victoria is not a foreign country in one sense of the word, yet its laws are the laws of that colony only. . . . It might as well be said that the laws of the State of Maryland would apply here."

So also in *Phillips* v. *Allan*, 8 B. & C. 477, it was held that an insolvent discharge under the laws of Scotland was no bar to an action brought by an English subject in a court in England on a debt contracted in England, although it appeared that the English creditor had appeared in the Scottish proceedings for the purpose only of opposing the discharge.

The case, then, before us is one in which a foreign railway corporation pleads in discharge of its liability to pay its nego-

tiable securities, held by citizens of the United States, and which were delivered and are payable in this country, not that it had paid such securities; not that there had been a composition in bankruptcy embracing these claims; not that any court had given its sanction to the scheme in question; but that a statute of a foreign country, without the consent of those who did not approve such scheme, and without giving an opportunity before any authorized tribunal to show that such scheme ought not to be ratified, had absolved it from liability to meet its contract engagements. This defence my brethren feel obliged, upon grounds of international comity, to sustain. Thus an American court denies to American holders of foreign railway securities what an English court would not deny to English holders of American railway securities. An English court would not permit the rights of Englishmen, growing out of a contract between them and a foreign corporation, which is to be performed in England, to be injuriously affected by foreign laws in violation of the terms of that contract. I fully concur in what the circuit judge said:

"If any of our own States had passed such an act as the one under consideration, it would have been the duty of the courts of that State to treat it as an unlawful exercise of power; and certainly it cannot be expected that this court will tolerate legislation by a foreign State which it would not sanction if passed here, and which, if allowed to operate, would seriously prejudice the rights of a citizen of this State. Comity can ask no recognition of such unjust foreign legislation, and the case falls under the qualifications of a general rule, which prescribes that when the foreign law is repugnant to the fundamental principle of the *lex fori*, it will be ignored."

The principles for which I contend are not affected, in their application to this case, by the circumstance that the legislation of Canada relates to the contracts of a quasi public corporation and not to contracts wholly between individuals. For, in determining whether a statute impairs the obligation of a contract, within the meaning of our Constitution, it must be conceded that that instrument protects such obligation against

legislative impairment as well in cases of contracts with railway corporations as of contracts between individuals. It is equally clear that debts held against such corporations are property of which the citizen may not be deprived without due process of law. We said in *Pritchard* v. *Norton*, 106 U. S. 132, that "a vested right of action is property in the same sense in which tangible things are property, and is equally protected against arbitrary interference. Whether it springs from contract or from the principles of the common law, it is not competent for the legislature to take it away." Railway corporations are, undoubtedly, public instrumentalities employed by government to accomplish public purposes. But in this country the legislative department may not, under the guise of regulating such corporations, arbitrarily deprive creditors of the benefit of their claims against them, or impair the obligation of contracts which individuals have with them. This, perhaps, would not be disputed were this a contest between American citizens, or even citizens of Canada, and an American railway corporation.

As I do not think that a foreign railway corporation is entitled, upon principles of international comity, to have the benefit, in our courts—to the prejudice of our own people and in violation of their contract and property rights—of a foreign statute which could not be sustained had it been enacted by Congress or by any one of the United States, with reference to the negotiable securities of an American railway corporation; and, as I do not agree that an American court should accord to a foreign railway corporation the privilege of repudiating its contract obligations to American citizens, when it must deny any such privilege, under like circumstances, to our own railway corporations, I dissent from the opinion and judgment of the court.

MR. JUSTICE FIELD, not being present at the argument of this case, took no part in the decision.