**YOUNG WOMEN'S CHRISTIAN ASSOCIATION OF THE NATIONAL CAPITAL AREA, INC., a District of Columbia Non–Profit Corporation, Appellant.**

v.

**ALLSTATE INSURANCE COMPANY OF CANADA, a Canadian Corporation, et al., Appellees.**

No. 00–7259.

United States Court of Appeals, District of Columbia Circuit.

Argued Nov. 20, 2001.

Decided Jan. 15, 2002.

Bardyl R. Tirana argued the cause and filed the briefs for appellant.

Elizabeth B. Sandza argued the cause for appellees. With her on the brief were Michael F. McBride, David M. Ross, Ronald W. Fuchs, Richard W. Driscoll, Stuart L. Peacock, William H. White Jr., John A. Scaldara and Donald J. Walsh.

Before: GINSBURG, Chief Judge, ROGERS and GARLAND, Circuit Judges.

Opinion for the Court filed by Circuit Judge ROGERS.

ROGERS, Circuit Judge:

The Young Women's Christian Association of the National Capital Area ("YWCA") appeals the grant of summary judgment to several insurance companies, contending principally that the district court erred in its choice of law ruling and, alternatively, in its application of law, having failed to abide by the language of the insurance policies and the applicable rules for construction of insurance contracts.

We reverse the district court's choice of law ruling and its application of law, and we remand the case for consideration of exclusions under the policies and related issues.

## I.

On November 30, 1979, YWCA contracted with Tiber Construction Company ("Tiber"), a Virginia corporation, for the construction of a new building at 9th and G Streets, N.W., in Washington, D.C. By subcontract, dated February 18, 1980, Tiber engaged Beer Precast Concrete, Ltd. ("Beer"), of Ontario, Canada, to furnish and install precast concrete panels for the building. Beer cast the panels for the YWCA's building in April–September 1980 and delivered and installed the panels August–October 1980. Before shipping them to the District of Columbia, Beer acid-etched the panels. The architect on the project advised Tiber, however, that some of the panels were unacceptable because they were chipped, warped, cracked, discolored, or without homogenous distribution of aggregate. Beer agreed to patch the precast panels and wash-down all of the panels at all elevations using cleaning agents and scrub brushes in an attempt to achieve uniformity of the finish. The on-site washing took place around October 1980. Nine years later, in late 1989 or early 1990, the YWCA became aware of imperfections—cracks, staining, and blemishes—in the precast concrete panels.

On August 28, 1990, YWCA filed suit in the United States District Court for the District of Columbia against Tiber for breach of contract and against Beer for breach of contract, breach of warranty, negligence, and misrepresentation. Following the grant of summary judgment to Tiber on Tiber's and Beer's cross-claims for contribution and indemnification, the parties stipulated that any judgment against Tiber would be entered against Beer. The misrepresentation claim was dismissed pretrial. On the remaining claims, YWCA presented evidence at trial regarding three causes of the damage to the concrete panels. The evidence of YWCA's two experts, Mark F. Williams and Bernard Erlin as well as Beer's expert, William F. Logan, showed that the primary cause of the deterioration of the panels was the introduction of excessive chloride ions when Beer improperly acid-etched the panels. This exposure to excessive chloride ions caused the steel imbedded in the panels to corrode, resulting in the cracking of the panels. The deterioration was exacerbated by Beer's failures to manufacture the panels with sufficient concrete cover over the imbedded steel, and to use galvanized reinforcing mesh, to protect the steel from attack by chloride ions where the concrete cover was less than one-and-a-half inches thick, as required by the contract specifications and industry standards. The corrosion of the imbedded steel and the resulting cracking was an ongoing, insidious process; the chloride ions slowly advance through the concrete until they reach the steel, corroding it on a progressive and continuing basis.

The jury found that Tiber and Beer had breached their contract with the YWCA, that Beer was negligent, and that YWCA had suffered $4.5 million in damages. The jury also found that Tiber and Beer had failed to prove that the YWCA knew or reasonably should have known that "there was a condition in the panels that would cause a person exercising ordinary care to make further inquiry as to the reasons for that condition." The district court entered judgment on January 31, 1994, for the YWCA in the amount of $4,504,978.47 (costs included).

The YWCA then filed suit, on April 5, 1994, in the District Court for the District of Columbia against Beer's seven Canadian insurers ("the Insurers") during 1979 to 1991, the period spanning the manufacture of the panels to the discovery of the damage:

Kansa General International Insurance Company ("Kansa") issued a comprehensive general liability policy with a $2 million limit, and an excess umbrella policy for $5 million, for the term from July 31, 1979 to July 31, 1980.

Allstate Insurance Company of Canada ("Allstate") issued a comprehensive general liability policy with a $2 million limit, and an excess umbrella policy for $5 million for the term from July 31, 1980 to July 31, 1981.

New Hampshire Insurance Company ("New Hampshire") issued two comprehensive general liability policies with terms of July 31, 1982 to July 31, 1983 and July 31, 1983 to July 31, 1984 with limits of $1 million each.

Halifax Insurance Company ("Halifax") issued two comprehensive general liability policies with terms of July 31, 1984 to July 31, 1985 and July 31, 1985 to July 31, 1986 with limits of $1 million each.

Norad Reinsurance Company, Ltd. ("Norad") issued a comprehensive general liability policy with a term of July 31, 1986 to July 31, 1987 and a limit of $5 million.

Richmond Insurance Company (Barbatos), Ltd. ("Richmond") issued a policy for the term of July 31, 1987 to July 31, 1988.

American Home Assurance Company ("American Home") issued a comprehensive general liability policy with a term of June 21, 1989 to July 31, 1991 and a limit of $3 million.

The YWCA reached a settlement with Allstate, and on May 30, 1995, the district court dismissed YWCA's claims against Allstate. YWCA's suit against Richmond was dismissed. The district court entered a default judgment against Norad. YWCA was unsuccessful in its effort to collect from Kansa. Kansa filed for bankruptcy in December 1994, and on March 8, 1995, the Superior Court of Quebec ("Quebec Court") issued a Winding-up Order. On April 9, 1998, the Canadian Liquidator disallowed YWCA's submission of proof of its claims against Kansa because (1) there was no injury during the policy period within the meaning of Kansa's policies, (2) exclusions under the policies were implicated, (3) YWCA failed to give timely notice to Kansa of its alleged claims, and (4) YWCA did not comply with the Liquidator's request that it disclose the actual amount of its alleged damages. When YWCA did not, when granted additional time, make the requested disclosure, the Quebec Court entered a judgment against YWCA on February 2, 1999, on its claims against Kansa.

Meanwhile, in the district court here, on November 21, 1995, YWCA, Kansa, New Hampshire, and Halifax filed cross-motions for summary judgment. On August 12, 1998, the Magistrate Judge issued a report and recommendation that District of Columbia law should apply to the construction of the insurance policies, and that YWCA's and American Home's motions for summary judgment should be denied and New Hampshire's and Halifax's motions for summary judgment should be granted. By Order dated January 26, 1999, the district court rejected the Magistrate Judge's choice of law recommendation, concluding instead that Canadian law applied.

Thereafter, the district court granted Kansa's motion to dismiss on grounds of

comity, and in the alternative granted Kansa's motion for summary judgment. The district court also granted summary judgment to the three remaining Insurers. Applying Ontario law to determine whether there was coverage under the Insurers' occurrence-based policies, the district court identified four relevant triggers of coverage under Ontario law. The court rejected the "continuous trigger," which includes all times from exposure to the harm to its manifestation, because no Canadian court had applied it. It also rejected the "manifestation trigger," for which the trigger is the moment at which the damage becomes apparent or is discovered, because Canadian courts (other than a Quebec trial court), including the Ontario court, had rejected it. The district court distinguished Canadian cases that had applied an "injury-in-fact trigger," which looks to the time at which the damage actually occurred, explaining that both *Pickford & Black Ltd. v. Canadian General Insurance Co.*, 64 D.L.R (3d) 179, 185 (Can.1976), and *Dawson Creek v. Zurich Insurance Co.*, No. 12371, 1998 A.C.W.S.J. LEXIS 86772, at *24–*25 (B.C. Sup.Ct. Sept. 17, 1998), did not involve a single exposure that inevitably caused damage over time, but involved both an initial exposure and a later event that could be said to have caused the injury. In contrast, the court stated that several Canadian courts had applied the "exposure trigger," for which the triggering event is the exposure to the harm that causes the damage rather than the resulting damage to the property.

The district court then turned to the occurrence-based policies at issue. Observing that the terms of the Halifax policy speak of "exposure" during the policy period, and noting that the acid-etching process was the single moment of exposure at which time the damage became inevitable, the court found that no triggering event had occurred during Halifax's policy period. Rather, the exposure took place during the term of Allstate's policy. Finding that the New Hampshire and American Home policies did not indicate which trigger applies, the court construed the terms of these policies, namely, "injury," "destruction," and "damage," to refer only to the moment of the initial exposure at which time the damage becomes inevitable. Because, under the district court's analysis, the acid-etching process was the causative event when the damage became inevitable and there was no intervening causative event during the New Hampshire and American Home policies, it followed that these policies were not triggered.

## II.

On appeal, YWCA contends that the district court erred in ruling that Canadian law applies to its claims against the Insurers arising from Beer's negligence and breach of contract in the District of Columbia. YWCA contends first, that the district court erred in failing to conclude that there was no conflict of laws between the District of Columbia and Ontario because both apply a continuous trigger. YWCA contends alternatively that, under the substantial interests test, the correct choice of law is that of the District of Columbia where the YWCA building is located, and that under District of Columbia law, a continuous trigger applies to comprehensive general liability policies when the injury is continuous or progressive. *See Wrecking Corp. of Am., Va., Inc. v. Ins. Co. of N. Am.*, 574 A.2d 1348, 1350 (D.C.1990). Alternatively again, YWCA contends that even if Ontario law applies, the district court erred in relying on law of the Province of Saskatchewan that conflicts with the law of Ontario, explaining that in *International Comfort Products Corp. v. Royal Insurance Company of*

*Canada*, No.99–177332, 2000 A.C.W.S.J. LEXIS 48324, at *12 (Ont. Sup.Ct. Mar. 20, 2000), Ontario rejected the exposure trigger theory adopted in *University of Saskatchewan v. Fireman's Fund Insurance Company of Canada*, No. 2172, 1997 A.C.W.S.J. LEXIS 161238 (Sask. Ct.App. Oct. 10, 1997). YWCA maintains also that Ontario's application of the continuous trigger is consistent with the leading decision of the Supreme Court of Canada on the construction of insurance policies, *Reid Crowther & Partners Ltd. v. Simcoe & Erie General Insurance Co.*, 99 D.L.R. (4th) 741 (Can.1993), and that the district court failed to apply this precedent when it subjected all of the policies to an exposure trigger theory even though the language of the policies insures against occurrences.

 Because there is diversity of citizenship among the parties to this litigation, the law of the forum state supplies the choice of law standards. *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496, 61 S.Ct. 1020, 1021, 85 L.Ed. 1477 (1941). Under District of Columbia law, the court must first determine if there is a conflict

between the laws of the relevant jurisdictions. *Eli Lilly & Co. v. Home Ins. Co.*, 764 F.2d 876, 882 (D.C.Cir.1985) (citing *Fowler v. A & A Co.*, 262 A.2d 344, 348 (D.C.1970)); *Duncan v. G.E.W., Inc.*, 526 A.2d 1358, 1363 (D.C.1987). Only if such a conflict exists must the court then determine, pursuant to District of Columbia choice of law rules, which jurisdiction has the "more substantial interest" in the resolution of the issues. *See Nationwide Mut. Ins. Co. v. Richardson*, 270 F.3d 948, 953 (D.C.Cir.2001); *Eli Lilly & Co.*, 764 F.2d at 882; *Greycoat Hanover F St. Ltd. P'ship v. Liberty Mut. Ins. Co.*, 657 A.2d 764, 767–68 (D.C.1995).

 It is unnecessary to engage in a conflict of laws analysis. Both YWCA and the Insurers agree that the relevant jurisdictions are the District of Columbia and Ontario. Examination of both forums' laws reveals that no conflict of laws exists because both would apply a continuous trigger to the occurrence-based policies where the damage can be characterized as being continuous or progressive.[1]

1. In ruling that Canadian law applied, the district court relied upon *Liberty Mutual Insurance Co. v. Travelers Indemnity Co.*, 78 F.3d 639 (D.C.Cir.1996). In *Liberty Mutual*, the court examined which state law should govern a liability insurance policy and stated that "[u]nder District law, insurance contracts are governed by the substantive law of the state in which the policy is delivered." *Id.* at 642; *see also CSX Transp., Inc. v. Commercial Union Ins. Co.*, 82 F.3d 478, 482 (D.C.Cir.1996) (citing *Liberty Mutual* with approval). It is not altogether clear that *Liberty Mutual* correctly characterized the District of Columbia's choice of law rules. This court's decision in *Nationwide Mutual Insurance Co.*, applying the District of Columbia Court of Appeals decision in *Greycoat Hanover* suggests that the District of Columbia applies the law of the jurisdiction with the more substantial interest in the litigation, in considering what law to apply to insurance policies. *Nationwide Mut. Ins. Co.*, 270 F.3d at 953; *cf. Ideal Elec. Sec. Co. v. Int'l Fid. Ins. Co.*, 129

F.3d 143, 148 (D.C.Cir.1997). *Liberty Mutual* addressed neither *Greycoat Hanover* nor the more substantial interest test, relying instead on D.C. Court of Appeals decisions involving life insurance policies rather than liability policies. *Liberty Mut.*, 78 F.3d at 642 (citing *Levin v. John Hancock Mut. Life Ins. Co.*, 41 A.2d 841 (D.C.1945), and *Raley v. Life & Cas. Ins. Co. of Tenn.*, 117 A.2d 110 (D.C.1955)). Those District of Columbia cases are specific, however, to life insurance policies and rely on Supreme Court cases holding that the place of delivery of life insurance polices determines what state law should apply. *See Mut. Life Ins. Co. of N.Y. v. Johnson*, 293 U.S. 335, 339, 55 S.Ct. 154, 79 L.Ed. 398 (1934); *Northwestern Mut. Life Ins. v. McCue*, 223 U.S. 234, 248, 32 S.Ct. 220, 56 L.Ed. 419 (1912); *Mut. Life Ins. Co. of N.Y. v. Cohen*, 179 U.S. 262, 264, 21 S.Ct. 106, 45 L.Ed. 181 (1900).

The instant appeal, however, does not present the occasion to decide whether *Liberty Mutual* correctly characterized District of Co-

## A.

Neither the highest court in Ontario nor the Supreme Court of Canada has addressed which trigger theory applies to occurrence-based policies. But in *Reid Crowther & Partners Ltd. v. Simcoe & Erie General Insurance Co.*, 99 D.L.R. (4th) 741 (Can.1993), the Supreme Court of Canada set forth general principles for interpreting insurance contracts that direct courts to the language of the particular insurance policy:

> In each case the courts must examine the provisions of the particular policy at issue (and the surrounding circumstances) to determine if the events in question fall within the terms of coverage of that particular policy.... In each case, the courts must interpret the provisions of the policy at issue in light of general principles of interpretation of insurance policies, including, but not limited to:
>
> (1) the contra proferentem rule;
>
> (2) the principle that coverage provisions should be construed broadly and exclusion clauses narrowly; and
>
> (3) the desirability, at least where the policy is ambiguous, of giving effect to the reasonable expectations of the parties.

*Id.* at 751–52.

Examination of the language in the Insurers' policies indicates the appropriateness of applying a continuous trigger. The Halifax policies cover "occurrences" and define an "occurrence" as including "a continuous or repeated exposure during the Policy Period to a condition or conditions which result in injury to or destruction of property neither expected nor intended from the standpoint of the Insured." Similarly, the American Home policy covers "accidents" and defines "accident" as including "continuous or repeated exposure to conditions which results in property damage neither expected nor intended from the standard point of the Insured." The plain terms of these policies support application of the continuous trigger where, as here, the exposure to the damaging excessive chloride ions was continuous in nature. Although the Insurers, like the district court, take the position that there was only a single exposure that caused continuous damage, this characterization of the nature of the damage is belied by undisputed evidence describing the damage. That evidence showed that the damage was the result of continued exposure to excessive chloride ions that migrate through the concrete, and that the initial exposure to the chloride ions thus resulted in continuous exposure to those same ions as they migrated through the concrete and slowly corroded the steel.

In addition, the language of the New Hampshire policies also indicates the appropriateness of applying the continuous trigger. The New Hampshire policies cover "physical injury to or destruction of property which occurs during the policy period," and define "occurrence" as including "injurious exposure to condition which results, during the policy period, in bodily injury or property damage neither expected nor intended from the standpoint of the Insured." The district court interpreted this language as setting forth an exposure trigger. Yet the policy language provides that it is the property damage and not the exposure to it that must occur during the policy period. The language is thus con-

lumbia choice of law rules because it is unnecessary to engage in a conflict of laws analysis.

sistent with the continuous trigger theory, which defines damage broadly to include the entire process of damage from exposure to manifestation when the damage is of a continuous and progressive nature. *Cf. Keene Corp. v. Ins. Co. of N. Am.*, 667 F.2d 1034, 1045–47 (D.C.Cir.1981).

Even if the Insurers' policies might reasonably be read differently, the contract interpretation principles set forth by the Supreme Court of Canada point to application of the continuous trigger. First, the policy is to be construed against the drafters. *See Reid Crowther*, 99 D.L.R. (4th) at 751–53. Neither Halifax, nor New Hampshire, nor American Home contend in their brief that the contra proferentem rule is inapplicable to its policy because it did not draft it. Nor do they contend that the language of the policies was imposed by statute. Second, even if there is doubt as to which party drafted the policies, the coverage provisions are to be interpreted broadly. *Id.* Thus, under Canadian principles of contract interpretation, the court is to interpret the policies to maximize coverage, which also points to application of the continuous trigger theory.

This result is consistent with the law of Ontario, which recognizes a continuous trigger theory. In a case not cited by either side in their briefs, an Ontario Superior Court judge in *Alie v. Bertrand & Frere Construction Co.*, No. 2104–1992, 2000 A.C.W.S.J. LEXIS 56664 (Ont. Sup. Ct. Apr. 17, 2000), provided a thorough and persuasive analysis of the relevant considerations in applying trigger theories. In *Alie*, the court considered which of the four triggers to apply for coverage of property damage consisting of continuous deterioration of the foundations of homes caused by the use of fly ash in the concrete. *Id.* at *19–*20, *190–*91. The court rejected the exposure theory as being inconsistent with the language of the

policies. *Id.* at *194. The policies provided coverage for property *damage* occurring during the policy period. *Id.* Because the damage was continuous, the court rejected limiting coverage to only the policy that covered the period of exposure. *Id.* The court rejected the manifestation theory, as being inconsistent with the policies' language, which focuses on the damage and not the discovery of the damage. *Id.* at *198. The court approved of the injury-in-fact theory because it was most consistent with the language of the policies. *Id.* at *199–*200. Nonetheless, recognizing the practical difficulty of determining when the damage actually occurred because it was progressive over time, *id.* at *200–*01, the court adopted a combination of the injury-in-fact and the continuous triggers, applying the principle that "[a]ll carriers who were on the risk from the inception of harm to the time the loss was no longer contingent should be liable to the insured." *Id.* at *203 (quoting *Zurich Ins. Co. v. Transamerica Ins. Co.*, 34 Cal.Rptr.2d 913, 922 (Cal.Ct.App.1994), *superseded by* 38 Cal.Rptr.2d 345, 889 P.2d 539 (Cal.1995)); *id.* at *205–*06. The court reasoned that because the injury was ongoing, this combined approach was necessary in order to apportion the damage equitably over time, *id.* at *204, that this theory was most consistent with the policy language, *id.* at *206, and that this theory was consistent with the intention of the parties, *id.* at *204–*06.

The Insurers' post-argument submissions do not persuade us of any reason to doubt the *Alie* judge's analysis of Ontario law. First, although *Alie* is a trial court decision currently on appeal, that it represents persuasive authority as to which trigger Ontario law would apply is reflected in *International Comfort Products Corp. v. Royal Insurance Company of Canada*, No. 99–177332, 2000 A.C.W.S.J. LEXIS 48324 (Ont. Sup.Ct. Mar. 20, 2000), in which an-

other Ontario trial judge had previously adopted the continuous trigger, reasoning that the continuous nature of the damage made it difficult to determine when damage occurred during the policy periods. *Id.* at *12. The Insurers' attempt to distinguish *International Comfort* as applying only to the broader duty to defend rather than the duty to indemnify misses the mark. They rely on *St. Paul Fire and Marine Insurance Co. v. Durabla Canada Ltd.*, 29 O.R. (3d) 737 (Ont. Ct.App.1996), in which the Ontario Court of Appeals held that because the duty to defend is broader than the duty to indemnify it was unnecessary to determine which trigger to apply in determining whether there was a duty to defend. *Id.* at 739. However, the court in *International Comfort* was not deciding whether the insurers had a duty to defend; the insurers conceded this. *Int'l Comfort*, 2000 A.C.W.S.J. LEXIS 48324, at *11. Rather, the question before the court was how to apportion the costs of the defense among the insurers. *Id.* at *11–*12. Indeed, the court distinguished *Durabla* on this ground. *Id.* Thus, although *International Comfort* involved the duty to defend, there is no indication in the opinion that, in determining which trigger to apply, the court viewed the insurers' duty as being any broader than in an indemnity case.

Second, contrary to the Insurers' contention, *Alie* does not conflict with *Sullivan Entertainment Inc. v. General Accident Assurance Company of Canada*, No. RE 7657/97 1998 Ont. Sup. C.J. LEXIS 482 (May 29, 1998), an Ontario trial court opinion rejecting the manifestation trigger. *Id.* at *17–*21. The damage in *Sullivan* was not of a continuous and progressive nature and hence was complete before the insurer came to the risk. Thus, the court had no occasion to consider whether to apply the continuous trigger. *See id.* at *1.

Third, *Alie* is not suspect, as the Insurers maintain, for failing to adopt the holding in *Cansulex Ltd. v. Reed Stenhouse Ltd.*, 1986 A.C.W.S.J. LEXIS 30665 (B.C. Sup.Ct. Mar. 10, 1986), which the Insurers characterize as adopting the exposure trigger. Although *Cansulex* held that the damage began upon exposure, triggering coverage, *id.* at *61, *72–*74, it did not have occasion to determine whether the continuous process of damage would have also triggered coverage under future policy periods, and thus is not inconsistent with the adoption of the continuous trigger.

Fourth, although the Insurers urge this court in both their brief and post-argument submissions to follow the district court in relying on *University of Saskatchewan v. Fireman's Fund Insurance Company of Canada*, No. 2172 1997 A.C.W.S.J. LEXIS 161238 (Sask. Ct.App. Oct. 10, 1997), in which the Saskatchewan Court of Appeal overturned the trial court's adoption of the manifestation theory, *id.* at *29, we decline to do so. The court of appeal held that the policy language did not support the manifestation theory because it refers to damage during the policy period and not the "discovery" of damage, *id.* at *23; that the manifestation theory is inconsistent with the concept of risk because it allows coverage even though the process of damage begins and the ultimate damage becomes inevitable before the insurer comes on the risk, *id.* at *25; and that if an insurer covered damage that occurred before it came on the risk, such coverage would be in the nature of warranty and not indemnity, *id.* at *27. *University of Saskatchewan* is distinguishable from the instant case in a material way. Although it involved continuous and progressive damage, *id.* at *5–*6, the damage was complete before the insurer came on the risk, *id.* at *20, causing the court to reject application

of the continuous trigger theory on this factual basis. *Id.* at \*20. By contrast, the damage at issue, while inevitable from the date of Beer's acidetching of the concrete panels, continued through the policy period of each of the Insurers. The court of appeal's rejection of the manifestation theory as contrary to the concept of risk is inapplicable where unknown and continuing damage occurs during the policy period. Because in *University of Saskatchewan* the damage did not progress into the policy period, it provides no guidance as to whether a continuous trigger should apply. Indeed, the court of appeal stated in *University of Saskatchewan* that all four trigger theories were not before it; rather, it was considering only whether the manifestation trigger theory should apply. *Id.* at \*19–\*20. Moreover, whatever the merits of this case may be for the Province of Saskatchewan, the *University of Saskatchewan* is not binding authority for the highest court of Ontario. *R. v. Wolf,* 2 S.C.R. 107 (Can.1974). The appellate court of Ontario is only bound by decisions of the Supreme Court of Canada, *id.,* which has not expressly adopted the exposure trigger. Nor have the Insurers suggested why it would be prudent to rely on the Supreme Court of Canada's non-merits dismissal of the appeal in *University of Saskatchewan* as an implicit approval of its holding.

Nothing in the cases from the Supreme Court of Canada, the courts of Ontario, nor any relevant statute indicates that a continuous trigger theory is disfavored in Ontario. Furthermore, the Supreme Court of Canada has stated that insurance policies, to the extent they are ambiguous, are to be construed against the insurers and broadly in favor of coverage. Accordingly, in light of Ontario law and the language of the policies, where the nature of the damage is continuous, the continuous trigger applies.

**B.**

Our analysis of District of Columbia law is to the same effect. In *Wrecking Corporation of America, Virginia, Inc. v. Insurance Company of North America,* 574 A.2d 1348 (D.C.1990), the D.C. Court of Appeals adopted the manifestation trigger as a general rule, noting that "the prevailing rule is that 'property damage occurs' at the time the damage is discovered or when it has manifested itself." *Id.* at 1350. Relying on this holding in contending that District of Columbia law applies a manifestation trigger, the Insurers fail to observe that in *Wrecking* the D.C. Court of Appeals recognized an exception to this general rule when the damage to the property can be characterized as "continuous or progressive." *Id.* Unlike in *Wrecking,* in which there was no evidence that the property damage was of a "continuous and progressive" nature, the evidence of Beer's negligence establishes that the corrosion caused by the exposure to excessive chloride ions was of a continuous and progressive nature. As such, this evidence suffices to bring the instant case within the exception recognized in *Wrecking.* Accordingly, as under Ontario law, District of Columbia law applies the continuous trigger where the damage is of a continuous nature. Furthermore, to the extent the language of the policies is ambiguous, District of Columbia law interprets ambiguities against the insurers. *Chase v. St. Farm Fire & Cas. Co.,* 780 A.2d 1123, 1127 (D.C.2001). Thus, under District of Columbia law, given the language of the policies and the continuous nature of the damage, the continuous trigger applies.

**III.**

On appeal, the Insurers have pointed to no evidence to create a dispute as to a

genuine issue of material fact regarding YWCA's evidence that the exposure to the chloride ions occurred in 1980 and that the damage caused by the excessive chloride ions began to manifest itself around November-December 1989 or early 1990. Applying the continuous trigger to the Insurers' policies, there is coverage under New Hampshire's policies, Halifax's policies, and American Home's policy. Accordingly, we reverse the district court's grant of summary judgment to these Insurers, and remand the case to the district court to address their claims that coverage is precluded by exclusions in the policies.

■ To the extent YWCA challenged the district court's extension of comity to the Quebec Court's resolution of YWCA's claims against Kansa in its opening brief, YWCA contends only that the district court acted contrary to the Ontario Court's view that one court should decide all of the claims against the Canadian insurers. No argument is made that the Ontario Court's reasoning for staying Halifax's declaratory judgment action was binding on the district court, and the mere existence of this reasoning does not defeat the extension of comity to the decision of the Quebec Court. The Quebec Court considered all of YWCA's present claims on the merits, and YWCA fails to point to a distinction between the United States and Canadian justice systems that would weigh against comity. *See Clarkson Co., Ltd. v. Shaheen,* 544 F.2d 624, 629–30 (2d Cir.1976); *see also Canada S. Ry. Co. v. Gebhard,* 109 U.S. 527, 3 S.Ct. 363, 27 L.Ed. 1020 (1883). Accordingly, we affirm the district court's ruling on comity.

Finally, because the issues of whether the Insurers are liable to YWCA for breach of their duty to defend and attorneys' fees turn on the applicability of the policy exclusions and the district court did not address these issues, we remand these issues as well.