830 F.2d 1260
 4 U.S.P.Q.2d 1355
 REMINGTON RAND CORPORATION-DELAWARE
v.
BUSINESS SYSTEMS INCORPORATED, Global Business Corporation,
Frank Capadano & Art Barber, Remington Rand, B.V. & Xerox.
Appeal of BUSINESS SYSTEMS, INC., B.V. and BSI Office Equipment, Inc.
 Nos. 86-5588, 86-5589 and 86-5590.
 United States Court of Appeals,
Third Circuit.
 Argued June 23, 1987.
Decided Oct. 5, 1987.
Rehearing and Rehearing In Banc Denied Oct. 28, 1987.
 
 Abdul W. Wohabe, Law Offices of Abdul W. Wohabe, New York City (Joseph A. Wolinsky (argued), Raffi Momjian, Marc A. Blom, of counsel), for appellants.
 James C. McConnon (argued), Paul & Paul, Lewis H. Van Dusen, Jr., Drinker, Biddle & Reath, Philadelphia, Pa., (David M. Satz, Jr., Saiber, Schlesinger, Satz & Goldstein, Newark, N.J., of counsel), for appellee Remington Rand Corp.-Delaware.
 Before GIBBONS, Chief Judge, WEIS and ALDISERT, Circuit Judges.
 OPINION OF THE COURT
 ALDISERT, Circuit Judge.
 
 
 1
 Three appeals from a judgment of the district court in a typewriter trade secret misappropriation case filed by the Remington Rand Corporation as an adversary action in bankruptcy against Business Systems, Inc., B.V., a Dutch corporation (hereinafter BSI B.V.), and BSI Office Equipment, Inc., an affiliated United States corporation (hereinafter BSI U.S.), raise a plethora of issues, most with international overtones.[1] BSI B.V. and BSI U.S. are the appellants and they have challenged virtually every legal issue decided by the district court.
 
 
 2
 According to the appellants, the district court erred in: (a) concluding that there was a misappropriation of typewriter trade secrets, (b) failing to respect the act of state doctrine, (c) failing to extend comity to a Dutch court order, (d) imposing joint liability against both BSI B.V. and BSI U.S., (e) issuing an order for relief that required turning over documents relating to manufacturing know-how and imposed a constructive trust on proceeds derived from the know-how, (f) holding BSI B.V. in civil contempt, (g) awarding attorney's fees in general as part of the contempt order, and (h) awarding excessive fees in particular.
 
 I.
 
 3
 The nucleus of these appeals is the know-how to produce the SR-101, an electric typewriter similar to the International Business Machines Selectric II. The Remington Rand Corporation, now known as the Kilbarr Corporation (hereinafter Remington U.S.), acquired the know-how in 1978 and licensed its Dutch subsidiary, Remington Rand B.V. (hereinafter Remington B.V.), to use this know-how to produce the SR-101 at a plant in Den Bosch, Holland. On March 25, 1981, Remington B.V. entered "suspension of payments" proceedings in The Netherlands (surseance van betaling ), the Dutch equivalent of reorganization under Chapter 11 of the United States Bankruptcy Code, 11 U.S.C. Secs. 1101-1174. Three days later, Remington U.S. entered reorganization under Chapter 11 in the District of New Jersey. Remington B.V. was declared bankrupt in The Netherlands on May 26, 1981, but Remington U.S. was successfully reorganized.
 
 
 4
 On June 4, 1981, the Dutch trustees in charge of the Remington B.V. bankruptcy sold the Den Bosch plant as a going concern to BSI B.V.; this sale included the know-how to produce the SR-101 typewriter. On August 17, 1981, Remington U.S. filed an adversary action against BSI B.V. in the United States Bankruptcy Court for the District of New Jersey. Remington U.S. claimed that BSI B.V. misappropriated its trade secrets in the SR-101 when BSI B.V. bought the Den Bosch plant and sought to preliminarily enjoin BSI B.V.'s use of the secrets.
 
 
 5
 The bankruptcy judge denied preliminary relief to Remington U.S. On September 24, 1982, the judge held that because Remington U.S. did not demonstrate a likelihood of success on the merits of its know-how misappropriation claim, it was not entitled to a preliminary injunction. On January 23, 1984, however, the bankruptcy court issued an opinion after a final hearing on liability, in which it held that Remington U.S. had made out a misappropriation claim. On May 8, 1984, the bankruptcy court rendered an opinion on equitable relief in which it made recommendations to the district court.
 
 
 6
 In requesting equitable relief, Remington U.S. sought to restrain BSI B.V. from manufacturing or selling the SR-101 for two and one-half years, the time allegedly needed to develop the typewriter without the use of Remington's trade secrets. Remington U.S. also sought the imposition of a constructive trust on certain BSI assets to secure any damage recovery ultimately awarded to Remington. In making its recommendations to the district court, the bankruptcy court refused to recognize Remington U.S.'s request for a two and one-half year injunction. The court determined that any "headstart" BSI received on account of the misappropriated know-how was minimal; it stated that BSI could recreate the essentials of the trade secrets from scratch within six months. BSI later tried to use this determination as a way to limit its possible tort liability flowing from the misappropriation of Remington U.S.'s trade secrets. Additionally, the bankruptcy court recommended that a constructive trust be imposed on BSI's assets that were derived from the sale of the typewriters using Remington U.S.'s know-how.
 
 
 7
 Two significant events took place in the interim between the bankruptcy court's preliminary injunction opinion and its opinion after the final hearing on liability. First, on May 11, 1983, Remington U.S. filed an amended complaint that named BSI U.S. as an additional defendant; the final determination of liability was made after the case was tried on that complaint. Second, on August 17, 1983, BSI B.V. entered suspension of payments proceedings in The Netherlands, with J.A.M. Banning, a Dutch citizen, as its court-appointed trustee.
 
 
 8
 On September 6, 1984, the New Jersey district court delivered an oral opinion adopting the bankruptcy court's recommendations on liability and equitable relief. That same day, the district court filed an order for interim equitable relief that, in relevant part, ordered BSI U.S. and BSI B.V. to turn over copies of know-how documents and derivatives therefrom; to account for products produced from the misappropriated know-how, and to hold in trust for Remington U.S. any such products or proceeds therefrom; and, in lieu of holding the products and proceeds in trust, to provide security equivalent to their value.
 
 
 9
 On February 6, 1985, the district court found BSI B.V. and Banning in civil contempt of the September 6 equitable relief order and accordingly imposed sanctions upon them. In addition to several remedial sanctions, the court imposed three coercive sanctions on BSI B.V. and Banning: first, the court ordered a warrant to issue for the arrest of Banning; second, the court enjoined BSI B.V. from transferring any single element electromechanical typewriters or parts, or any proceeds derived therefrom; third, the court ordered that any defense based on the "head start" value of the know-how be stricken from defendants' pleadings with regard to recovery of damages. On February 13, 1985, BSI B.V. was declared bankrupt under Dutch law and Banning was appointed administrator of BSI B.V.'s estate.
 
 
 10
 On June 27, 1986, the district court rendered a final judgment on damages. Pursuant to the court's imposition of sanctions, that judgment did not take into account any limitation on damages which might have followed from BSI's alleged headstart or lead time defense. The judgment awarded Remington U.S. $210,879,481 against BSI B.V. and BSI U.S., jointly and severally; this judgment later was increased under Rule 60(a), F.R.Civ.P., to $221,409,481. On September 24, 1986, the district court adjudged BSI B.V. and Banning liable to Remington U.S. for $82,685.20 in attorneys' fees incurred by Remington U.S. in pursuing BSI B.V. and Banning's contempt. On November 14, 1986, BSI U.S. filed for reorganization in the United States.
 
 II.
 
 11
 BSI first challenges the district court's determination that it is liable for misappropriating Remington U.S.'s trade secrets in the SR-101.[2] After conducting hearings at which all sides introduced extensive expert testimony on Dutch law, the bankruptcy court concluded that the elements by which BSI's liability should be measured were: (1) some inappropriate act by Remington B.V.'s Dutch trustees, and (2) some inappropriate act by or imputed to BSI. The district court adopted this formulation and no party disputes it on appeal. BSI contends, however, that neither element was established. We shall address each element in turn.
 
 A.
 
 12
 The district court adopted the bankruptcy court's determination that the propriety of the Dutch trustees' acts should be measured by reference to Dutch law; this determination, too, is not disputed on appeal. The question presented is whether the Dutch trustees committed an inappropriate act under Dutch law. As a question of foreign law, this issue receives plenary review. F.R.Civ.P. 44.1.
 
 
 13
 BSI constructs its argument on a syllogism based on the following logical progression: (1) Remington B.V.'s trustees were duty-bound under Dutch bankruptcy law to sell all of Remington B.V.'s assets in order to create a fund from which its creditors could be paid; (2) the know-how in the SR-101 was one such asset; (3) proceeds from the sale of Remington B.V.'s assets were to be paid only to verified claims filed against its estate, on a pro rata basis; (4) Remington U.S. was required to file a verified claim in order to recover for the trustees' sale of the know-how; (5) because Remington U.S. did not file such a claim, the trustees had no duty to pay it for the know-how; (6) therefore, the trustees did not violate Remington U.S.'s rights by selling the know-how to BSI. Although most of BSI's assertions appear to be borne out by the Dutch authorities to which they cite, minor premise (2) is not so supported. Notwithstanding that the trustees were bound to sell all of Remington B.V.'s assets, no Dutch authority cited to or discovered by this court suggests that the trustees were bound to commit torts in order to enlarge Remington B.V.'s estate.
 
 
 14
 Remington B.V. manufactured the SR-101 with know-how acquired from Remington U.S. pursuant to a licensing agreement. The licensing agreement contained a confidentiality clause that provided: "All information received by [Remington B.V.] shall be treated with reasonable confidence consistent with the purposes of the Agreement. [Remington B.V.] will not permit such information to be disclosed to third persons...." App. at 1688-89. Without question, this clause imposed a duty of confidentiality upon Remington B.V.; the issue is whether it imposed a correlative duty upon Remington B.V.'s trustees.[3]
 
 
 15
 Article 1401 of The Netherlands Civil Code provides: "Each wrongful act, by which damage is done to another, imposes upon him by whose fault that damage was caused the obligation to reimburse the same." Netherlands Civil Code, art. 1401, reprinted in addendum to br. of BSI at 5. As stated by the Dutch Supreme Court, article 1401 proscribes any act that
 
 
 16
 either infringes upon another's rights, or is contrary to the legal duty of the actor, or conflicts with either the bonos mores or the duty of good care to be observed in social intercourse with regard to another's person or goods....
 
 
 17
 Lindenbaum v. Cohen, 1919 NJ 161 (HR), reprinted in app. at 1752. Article 1401 provides a recognized tort action for trade secret misappropriation. See W. Drucker & G. Bodehausen, Summary Understanding of the Law With Respect to Intellectual Property 207 (6th ed. 1984), reprinted in addendum to br. of BSI at 57 ("Article 1401 can be called on against a person who contrary to his duty has violated the secrecy [of a trade secret] or who has provoked or stimulated that violation."). Dutch society's protection of trade secrets also is reflected in article 273 of The Netherlands Penal Code, which provides criminal penalties for employees who breach the confidentiality of their employers' trade secrets. Netherlands Penal Code, art. 273, reprinted in addendum to br. of BSI at 6. By transferring the confidential know-how to BSI B.V. without compensating Remington U.S., the trustees breached their "duty of good care to be observed in social intercourse."
 
 
 18
 After hearing extensive testimony by Dutch law experts, the bankruptcy court held that, as an industrialized society, The Netherlands would afford protection to Remington U.S.'s trade secrets in the hands of the trustees. It furthermore held that, by transferring the Den Bosch plant to BSI B.V. without compensating Remington U.S. for its trade secrets, the trustees committed an inappropriate act. The district court adopted these conclusions and we agree. Accordingly, we hold that the district court did not err in holding that the first element of the liability standard was met.
 
 B.
 
 19
 To determine whether BSI committed an inappropriate act sufficient to meet the second element of the liability standard, the bankruptcy court evaluated BSI's conduct according to New Jersey law, and, alternatively, according to Dutch law. Under either choice of law, the bankruptcy court held, it was required that BSI knew or should have known of the know-how licensing agreement between Remington U.S. and Remington B.V. when BSI purchased the Den Bosch plant from Remington B.V.'s trustees. In its final opinion on liability, the bankruptcy court found that BSI had the requisite knowledge of the licensing agreement. This issue of knowledge therefore is dispositive. BSI contends that the bankruptcy court's finding of knowledge, adopted by the district court, was clearly erroneous. Because the question whether BSI knew or should have known of the licensing agreement is a question of fact, it is reviewed under the clearly erroneous standard. Universal Minerals v. C.A. Hughes & Co., 669 F.2d 98, 101-03 (3d Cir.1981); F.R.Bankr.P. 8013.
 
 
 20
 In making its finding, the bankruptcy court relied in part on references in two audit reports prepared on behalf of BSI, while BSI was contemplating purchasing Remington B.V. One audit report stated, "[I]n the budget for the months April and May 1981, and the budget for 1981/1982 ... possible royalties or license fees due for the SR-101 ... have [not] been taken into account." App. at 1814. Another audit report stated, "With regard to problems like the industrial ownership, so that development, production and selling could be continued undisturbed, the draft of a provisional contract, and possible litigations, we may refer to the activities of your other advisors." Id. at 1800.
 
 
 21
 The bankruptcy court did not use these audit reports as the sole basis for its finding. It determined that the reports contradicted earlier testimony by BSI's officers. The court recognized that I.A.M. Khatib (the BSI principal primarily involved in purchasing Remington B.V.) was a sophisticated businessman and had testified that, had he known of royalties being paid by Remington B.V., he would have inquired into their basis before purchasing the company. Moreover, the bankruptcy court acknowledged that BSI probably was made aware of the licensing agreement by Remington B.V.'s trustees, with whom BSI conducted negotiations regarding the sale of the Den Bosch plant. The trustees knew of the licensing agreement through their access to monthly reports of royalties paid by Remington B.V. to Remington U.S., as well as through negotiations they had with Roger Wollert, Remington U.S.'s president.
 
 
 22
 Because the finding that BSI knew or should have known of the licensing agreement is not devoid of credible evidentiary support and is rationally related to the evidentiary data, it is not clearly erroneous. See Krasnov v. Dinan, 465 F.2d 1298, 1302 (3d Cir.1972). When combined with our conclusion that the trustees committed an inappropriate act by selling Remington U.S.'s trade secrets to BSI, this finding fulfills the standard by which BSI's liability is to be measured. Accordingly, we hold that the district court did not err in determining that BSI is liable to Remington U.S. for misappropriating the trade secrets in the SR-101.
 
 III.
 
 23
 BSI argues that the bankruptcy and district courts erred in entertaining Remington U.S.'s suit, because it should have been precluded by the act of state doctrine. It contends that those courts should not have judged the propriety of acts by Remington B.V.'s Dutch trustees because they were acts of state. We do not agree that the acts of a foreign debtor's trustees rise to the dignity of acts of a foreign sovereign. Acts of bankruptcy trustees are not "considered policy determination[s] by a government to give effect to its political and public interests...." See Mannington Mills, Inc. v. Congoleum Corp., 595 F.2d 1287, 1294 (3d Cir.1979) (issuance of patent is not act of state); see also Timberlane Lumber Co. v. Bank of Am., 549 F.2d 597, 608 (9th Cir.1976) (Honduran court's enforcement of security interest under its own law was not act of state). We therefore hold that the acts of a foreign debtor's trustees should not be afforded deference under the act of state doctrine. Accordingly, the bankruptcy and district courts did not err in entertaining Remington U.S.'s claim.
 
 IV.
 
 24
 Alternatively, BSI invokes the concept of international comity in several ways. First, it argues that, because a Dutch court approved the trustees' sale to BSI B.V. of the trade secrets in the SR-101, the concept of international comity therefore should have precluded any inquiry into the propriety of that transaction. On June 1, 1981, a Dutch court rendered an order approving the trustees' sale of enumerated assets of Remington B.V. to Khatib. The bankruptcy court found that the Dutch court's order listed the assets to be sold, but that this order did not mention intellectual property in general, or know-how in the SR-101 in particular. On June 4, 1981, the trustees entered into a purchase agreement with Khatib, as president of BSI B.V. The purchase agreement expressly mentioned "the know-how belonging to the enterprise of Remington Rand B.V. and the drawings." App. at 1822. BSI argues that the Dutch court's order was entitled to comity. Because the extension or denial of comity is discretionary, we review this issue by the abuse of discretion standard. See In re Colorado Corp., 531 F.2d 463, 469 (10th Cir.1976); cf. Somportex Ltd. v. Philadelphia Chewing Gum Corp., 453 F.2d 435, 440 (3d Cir.1971) (extension of comity not mandatory), cert. denied, 405 U.S. 1017, 92 S.Ct. 1294, 31 L.Ed.2d 479 (1972). Findings of fact underlying a decision to extend comity, however, are governed by the clearly erroneous standard. Universal Minerals, 669 F.2d at 101-02.
 
 A.
 
 25
 Under the principle of international comity, a domestic court normally will give effect to executive, legislative, and judicial acts of a foreign nation. Somportex, 453 F.2d at 440. Moreover, judicial acts need not always be final judgments to be granted comity. See Colorado Corp., 531 F.2d at 469 (foreign court orders appointing bankruptcy trustees and liquidators should have been given comity). Notwithstanding these considerations, the Dutch court's order was not entitled to comity on issues the court did not decide. Flota Maritima Browning v. M/V Ciudad, 218 F.Supp. 938, 942-43 (D.Md.1963) (judgment of foreign court was not entitled to conclusive effect via comity, when domestic litigation presented different issue), aff'd, 335 F.2d 619 (4th Cir.1964); cf. Cramer v. General Tel. & Elecs. Corp., 582 F.2d 259 (3d Cir.1978) (res judicata case), cert. denied, 439 U.S. 1129, 99 S.Ct. 1048, 59 L.Ed.2d 90 (1979).
 
 
 26
 The bankruptcy court expressly found that the purchase agreement concluded between the trustees and BSI B.V. exceeded the scope of the Dutch court's order. The bankruptcy court also found that there was no evidence that any Dutch court knew of the purchase agreement or participated in its negotiation. Although BSI argues that the bankruptcy court improperly interpreted the Dutch court's order in not finding it to encompass the know-how as an asset authorized to be sold, BSI has not shown that finding to be clearly erroneous. Accordingly, the bankruptcy and district courts did not abuse their discretion in refusing to abstain on comity grounds and by inquiring into the propriety of the trustees' sale of Remington B.V.'s assets to BSI B.V.
 
 B.
 
 27
 Moreover, the bankruptcy and district courts did not abuse their discretion by denying comity to the Dutch court's order because Remington U.S. was not afforded due process before the Dutch tribunal. Cf. Somportex, 453 F.2d at 443 (foreign default judgment could not be given comity unless person affected was given notice and opportunity to be heard in foreign proceedings). The bankruptcy court found that Remington U.S. did not have notice or an opportunity to be heard there. It furthermore found that Remington U.S. was not a party to the purchase agreement between the trustees and BSI B.V. It therefore concluded that the Dutch court's order was not entitled to comity. We agree and accordingly hold that the bankruptcy and district courts did not abuse their discretion by denying comity to the Dutch court's order.
 
 C.
 
 28
 BSI argues that the bankruptcy and district courts improperly entertained Remington U.S.'s claim, because Remington B.V.'s Dutch bankruptcy proceedings were entitled to comity. This contention is without merit. Remington U.S.'s claim was against BSI, not Remington B.V. The rationale for granting comity in such a situation would be to allow a foreign debtor's assets to be distributed equitably. See Cunard S.S. Co. v. Salen Reefer Svcs., 773 F.2d 452, 457-58 (2d Cir.1985). Remington B.V.'s bankruptcy, however, cannot be used as a shield by BSI. Accordingly, the bankruptcy and district courts did not abuse their discretion on this basis.
 
 V.
 
 29
 BSI U.S. contends that the district court erred by imposing joint liability on both BSI B.V. and BSI U.S., arguing that there is an insufficient factual basis upon which liability can be imposed on BSI U.S. Because this issue was not properly presented to the bankruptcy or district courts, BSI U.S. may not raise this issue on appeal. Newark Morning Ledger Co. v. United States, 539 F.2d 929, 932 (3d Cir.1976). BSI U.S. responds that, because the district court's judgment imposes joint liability, the issue necessarily was raised and considered below. This argument is based upon a misunderstanding of the purpose for the rule expressed in Newark Morning Ledger. That rule reflects a policy that an appellate court will not predicate error on an issue upon which the district court was not provided with an opportunity to rule. This consideration is especially relevant here, where BSI U.S. challenges the sufficiency of the record to support joint liability, after the opportunity to develop the record has passed.
 
 VI.
 
 30
 Following its determination of BSI's liability, on September 6, 1984, the district court entered an equitable relief order that, in pertinent part, required BSI B.V. to turn over copies of all know-how documents it held; to account for all goods it produced with the misappropriated know-how; and to hold in trust all products or proceeds derived from the know-how, or alternatively, to provide security equivalent to that which otherwise would have been held in trust. BSI asserted that it could not post such security, which was later fixed at $3 million.
 
 
 31
 BSI argues that the district court violated the principle of international comity by entering the equitable relief order because BSI B.V., a Dutch corporation, was in suspension of payments proceedings in The Netherlands. Because, as stated previously, the grant or denial of comity is discretionary, we review this issue by the abuse of discretion standard. See Colorado Corp., 531 F.2d at 469; cf. Somportex, 453 F.2d at 440.
 
 A.
 
 32
 This court has previously explained at length the concept of international comity:
 
 
 33
 Comity is a recognition which one nation extends within its own territory to the legislative, executive, or judicial acts of another. It is not a rule of law, but one of practice, convenience, and expediency. Although more than mere courtesy and accommodation, comity does not achieve the force of an imperative or obligation. Rather, it is a nation's expression of understanding which demonstrates due regard both to international duty and convenience and to the rights of persons protected by its own laws. Comity should be withheld only when its acceptance would be prejudicial to the interest of the nation called upon to give it effect.
 
 
 34
 Somportex, 453 F.2d at 440 (citations and footnote omitted); see also Hilton v. Guyot, 159 U.S. 113, 163-64, 16 S.Ct. 139, 143-44, 40 L.Ed. 95 (1895). In the foreign bankruptcy context, comity is based on the additional rationales that the foreign debtor's assets will be distributed in an equitable fashion, Cunard S.S. Co. v. Salen Reefer Svcs., 773 F.2d 452, 457-58 (2d Cir.1985), and that one who conducts his affairs with foreign corporations subjects himself to foreign bankruptcy laws. Canada S. Ry. Co. v. Gebhard, 109 U.S. 527, 537-38, 3 S.Ct. 363, 370, 27 L.Ed. 1020 (1883).
 
 
 35
 Whether a United States court should refrain from granting relief because of comity considerations is always a difficult problem. But the difficulty is greatly intensified here. The factors are complex. The remedial laws of the United States and Holland are complicated. There was and is no guarantee that Remington U.S.'s judgment will ever be recognized by a Dutch court. There is no treaty on recognition of foreign judgments between The Netherlands and the United States. Therefore, a United States judgment must be presented to a Dutch court for its consideration. However, "[t]he findings of the foreign court are not conclusive on the Dutch court: the latter is free to attach significance to that decision as it sees fit." H. Warendorf, The Commercial Laws of The Netherlands 17 (1981).
 
 
 36
 In view of all of the foregoing precepts, proper attention to BSI's contentions requires a lengthy and detailed analysis. We will first address the district court's turn-over order.
 
 B.
 
 37
 Our starting point must be the determination by the district court, after extensive hearings, that BSI had misappropriated the know-how for the manufacture of the SR-101 typewriter. The parties and the trial courts debated whether this know-how, as intellectual property, would be classified as a personal or an absolute right under Dutch law. In reality, however, the know-how consisted of tangible property. It represented approximately 3,000 original documents located in The Netherlands, documents which contained engineering drawings and other manufacturing data. Remington U.S. insisted that it had no copies available in the United States.
 
 
 38
 The record discloses that although Remington U.S. did not have advance knowledge of the sale of Remington B.V. assets that included the documentary know-how, the American company did learn of the conveyance the day after it occurred. Remington U.S. declined to take formal action in the Dutch courts to regain possession of the bulky documentation, which the company's president described as so voluminous as to require several Boeing 747s to carry it; rather, Remington U.S. chose to negotiate with BSI. The proposals provided that BSI return the documents so that Remington U.S. could license another manufacturer or, in the alternative, that BSI supply typewriters to Remington U.S. App. at 2031A. The parties exchanged drafts of supplier contracts in June 1981, but neither proposal was accepted.
 
 
 39
 In August 1981, BSI submitted a plan of reorganization to Remington U.S.'s Chapter 11 proceeding in the United States. At approximately the same time, Remington U.S. filed suit against BSI alleging trademark infringement and misappropriation of the know-how.
 
 1.
 
 40
 Remington U.S. said that it had attempted to obtain another source of supply for typewriters, but had been hindered by its lack of the engineering drawings that remained in BSI's possession. In the meantime, BSI was selling typewriters in the United States through its American subsidiary.
 
 
 41
 The bankruptcy judge preliminarily determined, on evidence not controverted by Remington U.S., that the know-how could have been legitimately produced by BSI within six months even if it had not retained the original documents. No correlative finding was ever made about the length of time Remington U.S. would need or the amount of expense it would incur to prepare another set of drawings, either through contacts with the original producer, Sperry, or in combination with Remington's Italian subsidiary.
 
 
 42
 The litigation between Remington U.S. and BSI continued over the next few years with adverse consequences for both. In August 1983, BSI entered suspension of payments status under Dutch law. In September and October of that year, the Dutch trustee sought permission from the district court to release some of BSI U.S.'s funds that had been tied up pending resolution of Remington U.S.'s claims. The district court granted partial relief and released some of the funds to BSI. The court, however, required that a payment of $50 per each typewriter sold by BSI U.S. be placed in escrow. That figure corresponded roughly to the royalty specified in the licensing agreement between Remington U.S. and Remington B.V. for use of the know-how.
 
 
 43
 In September 1984, some months after the bankruptcy judge made findings on Remington U.S.'s request for a permanent injunction, the district court entered an order directing certain equitable relief pending a final judgment on damages. The court prohibited BSI from using the name "Remington" or its model numbers on their products. No appeal has been taken from that phase of the order.
 
 
 44
 The court also required BSI B.V. and BSI U.S. to provide Remington U.S. with "copies of all know-how documents." Little dispute exists about this phase of the order, although the Dutch trustee argued that he should not be forced to dissipate assets of the estate in order to make copies and ship them to Remington in the United States. The district court later amended its order to meet the objection by providing that original documents could be returned in lieu of copies.
 
 2.
 
 45
 Based on our holding that BSI misappropriated trade secrets in the SR-101, return of the know-how documents to Remington U.S. is an appropriate remedial measure. BSI voluntarily submitted to the jurisdiction of the bankruptcy court and vigorously litigated the misappropriation issue. It asserts no defense of unfairness or lack of jurisdiction.
 
 
 46
 In effect, the district court imposed a constructive trust upon the documents on the theory that they were the property of Remington U.S. even though in possession of the Dutch debtor. A parallel situation exists in American domestic law. Under state law, the imposition of a constructive trust upon a debtor's property generally confers on the true owner of the property an equitable interest in the property superior to that of the trustee. Matter of Quality Holstein Leasing, 752 F.2d 1009 (5th Cir.1985); In re N.S. Garrott & Sons, 772 F.2d 462 (8th Cir.1985). A trustee may be required to turn over to the beneficiary of a state law constructive trust the property that the debtor holds subject to such a trust. In re Auto-Train Corp., 810 F.2d 270 (D.C.Cir.1987); Georgia Pacific Corp. v. Sigma Serv. Corp., 712 F.2d 962 (5th Cir.1983). These holdings stem from the proposition that the bankrupt estate succeeds only to the title and rights that the debtor possessed in the property, and further subjects that property to the outstanding interest of trust beneficiaries. See 4 Collier on Bankruptcy Sec. 541.13 (15th ed. 1979).
 
 
 47
 The American court's turn-over order is entitled to compliance because the matter of ownership of the physical property has been fully litigated in the district court, and there has been no contrary ruling in The Netherlands based on evidentiary findings. Indeed, the Dutch supervising judge has subscribed to the transfer of the documents to Remington U.S., provided it be done in Holland.[4] In these circumstances, entry of the order does not offend comity or derogate the respect due the Dutch bankruptcy proceedings. See generally Nadelmann, The National Bankruptcy Act and the Conflict of Laws, 59 Harv.L.Rev. 1025 (1946). The question remaining at this point is which party must assume the cost of shipping the documents to Remington U.S. That decision, we believe, should be resolved by the district court after it reviews the pertinent facts.
 
 C.
 
 48
 We now turn to the most controversial aspect of the district court's September order--the imposition of a constructive trust on all typewriters, parts, and proceeds for the benefit of Remington U.S. until satisfaction of a final judgment. We believe that different considerations must apply.
 
 1.
 
 49
 It is critical to note that when this phase of the litigation began and BSI first appeared voluntarily in the American courts, the company had not yet filed for suspension of payments under Dutch law. Nor was BSI under the protection of Dutch bankruptcy law in June 1981, when the misappropriation occurred. Suspension of payments status did not begin until August 17, 1983, and the order of the district court was not entered until more than a year later--on September 6, 1984. The Dutch trustee protested that were he to obey the American court's order, he would violate his duty under the law of The Netherlands to treat all unsecured creditors equally. The trustee and BSI contended that any possible tort liability should be measured by the six-month lead time value of the know-how, as discussed by the United States bankruptcy judge. Under that theory, the tort liability of BSI would have been fixed before the company filed for suspension of payments in August 1983. According to BSI and the trustee, a judgment based on this pre-bankruptcy claim would not entitle Remington U.S. to priority over other unsecured prebankruptcy creditors.
 
 
 50
 The trustee was quoted in a newspaper article as saying that he did not intend to obey the American court's order because he considered it ineffective to control the disposition of BSI's assets outside the United States. Moreover, he asserted that the security interest in BSI's inventory held by Dutch banks was superior to that of unsecured creditors like Remington U.S.
 
 2.
 
 51
 After a hearing, the district court concluded that BSI and the trustee were in contempt for failing to obey the court's order and imposed remedial and coercive sanctions. As one of several coercive sanctions, the court directed that in the forthcoming hearings on damages, BSI would be barred from introducing evidence on the lead time value defense.
 
 
 52
 This ruling opened the door to Remington U.S.'s contention that the misappropriation was a continuing tort extending into the period after BSI assumed suspension of payments status in August 1983. Damages attributable to post-bankruptcy activity could be considered a boedelschuld (administrative expense) under Article 249 of The Netherlands Bankruptcy Code. App. at 2476A. As such, the damages would be given priority over pre-bankruptcy unsecured claims. In addition, the potential ceiling for a damage award was raised far above any amount that could have been assessed had the six-month limitation been imposed.
 
 
 53
 After the finding of contempt, BSI went into liquidation on February 13, 1985. The Dutch district court at 's-Hertogenbosch concluded on June 20, 1986, that the American court's constructive trust order did not affect the Dutch banks' rights under their security agreements with BSI. Id. at 2719A.
 
 3.
 
 54
 The case before us presents substantial equities on both sides. We view this to be a very difficult case. From Remington U.S.'s standpoint, an American court has resolved a dispute after the defendant voluntarily submitted to jurisdiction here. Realistically, the only certainty of recovery on a judgment lies in levying against the funds located in this country and subject to the constructive trust, which acts essentially as a security device.
 
 
 55
 From BSI's perspective, the judgment represents at least in part an unsecured debt, and the constructive trust grants a preference to Remington U.S. over other unsecured creditors. To the extent that the judgment is entitled to priority as the Dutch equivalent of an administrative claim, satisfaction of Remington U.S.'s claim by means of the attached funds in the United States without considering others in the same category offends notions of fairness. Remington U.S. would thus fare better than others in the distribution of a fund that is inadequate to fully compensate those in similar situations. From that point of view, defendants here are really arguing for the benefit of creditors not involved in the primary dispute between BSI and Remington U.S.
 
 4.
 
 56
 We have decided that the path to solution of this vexing problem lies in general precepts of transnational business affairs, especially those that apply to commercial reorganizations or bankruptcies. American courts have recognized the interest of foreign courts in liquidating or winding up the affairs of their own domestic business entities. Cunard Steamship Co. v. Salen Reefer Svs., 773 F.2d 452, 458 (2d Cir.1985); Matter of Colorado Corp., 531 F.2d 463 (10th Cir.1976). Creditors of an insolvent foreign corporation may be required to assert their claims against a foreign bankrupt before a duly convened foreign bankruptcy tribunal. Cunard, 773 F.2d at 458-59. Both American bankruptcy law and the Dutch doctrine of paritas creditorum share the fundamental principle that assets be distributed equally among creditors of similar standing. Cf. Drexel Burnham Lambert Group v. Galadari, 777 F.2d 877 (2d Cir.1985) (hearings required to establish consonance of newly enacted Dubai bankruptcy law with American law). That policy generally supports extending comity to the bankruptcy proceedings in The Netherlands. See Note, Predictability and Comity: Toward Common Principles of Extraterritorial Jurisdiction, 98 Harv.L.Rev. 1310, 1322-23 (1985).
 
 
 57
 Cutting against the extension of comity here, however, is the district court's obligation to guard against "forcing American creditors to participate in foreign proceedings in which their claims will be treated in some manner inimical to this country's policy of equality." Banque De Financement S.A. v. First Nat'l Bank of Boston, 568 F.2d 911, 921 (2d Cir.1977). See also Morales and Deutsch, Bankruptcy Code Section 304 and U.S. Recognition of Foreign Bankruptcies: The Tyranny of Comity, 39 Bus.Law. 1573, 1576-77 (1984). We, therefore, must look elsewhere to determine whether Congress has enunciated any expression of public policy that may assist us in properly weighing these controversial considerations. We believe that it has and additionally confirm that traditional factors underlying the notion of comity have an important bearing.
 
 5.
 
 58
 United States Bankruptcy Code section 304, 11 U.S.C. Sec. 304, expresses Congressional recognition of an American policy favoring comity for foreign bankruptcy proceedings. That section provides, in pertinent part, that an American bankruptcy court, at the request of a foreign administrator, may enjoin actions and the enforcement of judgments against the foreign debtor in this country. 11 U.S.C. Sec. 304(b). The House Reports states that "[p]rinciples of international comity and respect for the judgments and laws of other nations suggest that the court be permitted to make the appropriate orders under all of the circumstances of each case...." H.R.Rep. No. 595, 95th Cong., 2d Sess., reprinted in 1978 U.S. Code Cong. & Admin. News 5787, 6281. The court should be free to consider "economical and expeditious administration of the estate, ... protection of local creditors and equity security holders against prejudice and inconvenience in processing claims and interest in the foreign proceeding; prevention of preferential or fraudulent disposition of property of the estate...." Id.
 
 
 59
 The trustee in this case did not choose to avail himself of section 304, but we believe that this provision is not the exclusive source of comity. In re Enercons Virginia, Inc., 812 F.2d 1469, 1472 (4th Cir.1987). To augment the statutory provision, a court should give proper consideration to the relevant factors underlying the notion of comity. Cunard Steamship, 773 F.2d at 455-56; see also Somportex, 453 F.2d at 440; Mannington Mills, Inc. v. Congoleum Corp., 595 F.2d 1287 (3d Cir.1979); see generally L. Orfield & E. Re, International Law 736-37 (1965).
 
 6.
 
 60
 We now apply these somewhat conflicting precepts to events as they stood on September 1984, when the district court entered its constructive trust order. As noted earlier, BSI B.V. was then in suspension of payments status, and a trustee had been appointed under The Netherlands' law. BSI U.S., before the district court at the same time, had not yet declared bankruptcy and held assets in the United States to which the Dutch trustee laid claim. Remington U.S. looked to these assets for satisfaction of at least part of any money judgment it was likely to secure against BSI. The district court had previously ordered restrictions on the transfer of funds representing payments for typewriters furnished by BSI B.V. to its American subsidiary.
 
 
 61
 Although substantially hindering efforts by the BSI trustee to rehabilitate the debtor in The Netherlands, the preexisting limitations on BSI U.S. did not directly frustrate the trustee's authority and extended only to assets in the United States. The September 1984 order, however, went considerably beyond that scope and imposed a trust on all BSI assets anywhere in the world. The order purported to tie up the debtor's entire property for the ultimate benefit of Remington U.S., to the exclusion of all other creditors. The constructive trust operated directly on the property of the debtor outside the territorial limits of the United States, and extended to property under the protection of the Dutch bankruptcy laws.
 
 
 62
 We have to recognize that obedience by the Dutch trustee to the constructive trust order unquestionably would compromise, if not completely prevent, performance of his duties under the bankruptcy laws of The Netherlands. Although the constructive trust arrangement would provide additional security for a judgment that Remington U.S. was expected to secure, it did so at the expense of dooming any chance of rehabilitating the debtor and, in the event of liquidation, of giving priority to Remington U.S. over other BSI creditors. We believe that such an expansive and far-reaching order has the capacity to disregard the underlying reasons for comity, to interfere with the orderly administration of bankruptcy in The Netherlands, and to provoke a confrontation between the courts of the two countries. Yet we perceive no clear-cut, immediate solution to this vexing problem of private international law. Rather, the solution must come in stages.
 
 VII.
 
 63
 In the framework of our solution we decide the following. To the extent that the district court order seeks to attach BSI assets in the United States, it will not be disturbed. No international trappings surround the district court's imposition of a constructive trust over assets located in the United States. We see no aspects of comity implicated here. The same is not true, however, insofar as the attachment of foreign assets is concerned. We believe that before that aspect of the judgment can be sustained, certain conditions precedent, to be explained hereafter, must first be satisfied. We do not affirm the promulgation of an all-inclusive, far-reaching constructive trust; it therefore follows that the sanctions previously imposed against BSI cannot be sustained. In particular, the imposition of attorneys' fees must fall. Latrobe Steel Co. v. United Steelworkers of America, 545 F.2d 1336 (3d Cir.1976). Even more important, we must reverse that part of the district court's order, imposed as a sanction, that denied BSI use of the lead time valuation defense in the proceedings to determine damages. From this, it must necessarily follow that because an important defense in the damage assessment proceeding had been removed by way of a sanction, the damage proceedings must be retried.
 
 
 64
 Thus, we believe that the parties should be restored, by and large, to the situation that existed in September 1984. Having obtained a judgment on liability, it follows that Remington will obtain a money damage award at the retrial of the assessment proceedings and that this award will be reduced to judgment. What then should be done about the judgment that Remington U.S. is due to receive? The proper procedure is described in the famous early English case, Solomons v. Ross.[5] There, a Dutch trustee in bankruptcy claimed assets in London, which had been attached there by an English creditor after the debtor had become insolvent. Following proof that Dutch law recognized foreign and domestic creditors on the same footing, the English court held in favor of the Dutch trustee.
 
 
 65
 In a similar vein, before the district court makes a final decision on damages and equitable relief, Remington should request assurances from the Dutch courts that any judgment rendered by the district court in its favor will be recognized in The Netherlands. In this respect, because of the unusual circumstances present here, we believe that comity has to be a two-way street. Although reciprocity is no longer an absolute condition precedent to comity, Somportex Ltd. v. Philadelphia Chewing Gum Corp., 453 F.2d 435, 440 n. 8 (3d Cir.1971), it is always a permissible consideration, Cunard S.S. Co. v. Salen Reefer Svcs., 773 F.2d 452, 460 (2d Cir.1985), and here we believe it to be a consideration of extreme importance.
 
 
 66
 Accordingly, we have concluded that the solution to this very difficult problem must follow four discrete steps:
 
 
 67
 1) Recognizing that assets of BSI located in the United States must continue under the restrictions heretofore imposed, the district court must again determine the amount of damages to which Remington U.S. is entitled. The defendants will be free to interpose the lead time valuation defense in the proceedings to determine damages.
 
 
 68
 2) Remington must reduce any damage award it receives from the district court to judgment. It must then carry this judgment across the sea to the Dutch bankruptcy court and seek a declaratory judgment as to whether the Dutch court will properly recognize the American judgment in the claims against the bankrupt's estate. The declaration should state that the American judgment has the same force and effect as a judgment obtained in The Netherlands.
 
 
 69
 3) If the Dutch court does not timely rule on Remington U.S.'s request or fails to accord the district court's judgment proper respect, the district court is free to reconsider a proper remedy.
 
 
 70
 4) If the Dutch court decides to accord the district court's judgment full force and effect, then the district court, after hearing will have to decide, under concepts of equity, what, if any, portion of the constructive trust imposed on BSI assets in the United States should be forwarded to the Dutch court for distribution.
 
 
 71
 The district court should bade fealty to the doctrine of comity and recognize the Dutch bankruptcy proceedings, but only if and to the extent that the Dutch court is willing to recognize the American judgment in its proceedings. This solution would afford appropriate protection to an American creditor, yet also acknowledge the primary role of the Dutch court in equitably distributing the available funds. We realize that this theoretically direct step is potentially complicated by BSI U.S.'s present bankruptcy proceedings, which will ultimately place Remington U.S. against the Dutch banks. That matter, however, is not before us at this time, and we are in no position to rule on those conflicting claims. But one thing is clear from our direction to the district court--should the Dutch court in due course refuse to extend comity to the district court's judgment, the district court will be free again to enter appropriate remedies in accordance with the limitations previously discussed.
 
 VIII.
 
 72
 The judgment in favor of Remington U.S. to the extent that it assesses damages will be vacated; the issue of damages is remanded to the district court for further proceedings in accordance with the foregoing. The district court's order of September 6, 1984, will be vacated to the extent that it purports to impose a constructive trust on assets of BSI beyond the territorial limits of the United States. The court's order for sanctions and the finding of contempt will be vacated as well.
 
 
 73
 The cause will be remanded to the district court with a direction that it proceed in accordance with the foregoing.
 
 
 
 [1]
 These appeals arise out of the same facts as related appeals being separately disposed of by this court. See Remington Rand Corp. v. Banning, 830 F.2d 1256 (3d Cir. 1987); Remington Rand Corp. v. Amsterdam-Rotterdam Bank, 830 F.2d 1274 (3d Cir. 1987)
 
 
 [2]
 Except where the distinction is necessary, we will refer jointly to BSI B.V. and BSI U.S. as BSI
 
 
 [3]
 No party contends that the trustees did not have knowledge of the licensing agreement or the confidentiality provision. Indeed, the bankruptcy court expressly found that the trustees knew of the licensing agreement through Remington B.V.'s royalty reports, as well as through negotiations they conducted with Remington U.S.'s president, Roger Wollert
 
 
 [4]
 Judge J.H.W. Rullmann of the District Court of the Netherlands at 's-Hertogenbosch issued a decision on November 20, 1986 (amended December 12, 1986), that granted the trustee permission "to put the 'know-how documents' with regard to the production of single element typewriters at Remington's disposal, on condition that Remington itself comes over to collect these documents and on condition that there are no further expenses involved for the property." Exhibit B, Memorandum in Support of Motion to Supplement Record, dated December 24, 1986
 
 
 [5]
 Known from a scant note in 1 H. Bl. 131, n., 126 Eng.Rep. 79 n. (1764), more fully reported in a note to Neale v. Cottingham (Irish Ch. 1770), reported in Wallis-Lyne, Irish Chancery Reports 54, 59 n. (1839). See Nadelman, Solomons v. Ross and International Bankruptcy Law, 9 Mod.L.Rev. 154 (1946)