The KILBARR CORPORATION, formerly known as Remington Rand Corporation, Plaintiff,

v.

BUSINESS SYSTEMS INCORPORAT-ED, B.V., and BSI Office Equipment Inc., Defendants.

Civ. A. No. 84–261.

United States District Court, D. New Jersey.

Feb. 10, 1988.

Paul & Paul by James C. McConnon, Drinker Biddle & Reath, by Lewis H. Van Dusen, Jr., Philadelphia, Pa., and Saiber, Schlesinger, Satz & Goldstein by David M. Satz, Jr., Newark, N.J., for plaintiff.

Jamieson, Moore, Peskin & Spicer by Arthur Meisel, Princeton, N.J., Abdul W. Wohabe, by Joseph A. Wolinsky, New York City, for defendants.

## OPINION

BISSELL, District Judge.

### BACKGROUND

This matter is before the Court on remand from the United States Court of Appeals for the Third Circuit for further proceedings in accordance with that court's decision in *Remington Rand Corp.–Delaware v. Business Systems Inc.*, 830 F.2d 1260 (3d Cir.1987). In its decision, the Third Circuit affirmed this Court's holding that Business Systems Inc., B.V. ("BSI, B.V."), a Dutch corporation, and BSI Office Equipment, Inc. ("BSI, U.S."), an affiliated United States corporation,[1] are liable to Remington Rand Corporation, now known as Kilbarr Corporation, for misappropriating the trade secrets on the SR–101, an electric typewriter similar to the International Business Machines Selectric II. *Id.* at 1265. The court of appeals left undisturbed this Court's order imposing a constructive trust on BSI assets in the United States, while reversing the application of such trust to BSI's foreign assets. *Id.* at 1272. Accordingly, the sanctions previously imposed for failure to comply with the terms of the constructive trust, now vacated as to foreign assets, were reversed. *Id.* The imposition of attorneys' fees was reversed, as was the sanction imposed on BSI denying use of the lead time valuation (or "head start") defense in the damages proceedings before this Court. *Id.* Consequently, the damage proceedings

must be reconvened. The Third Circuit's instruction is as follows:

> [W]e believe that the parties should be restored, by and large, to the situation that existed in September 1984. Having obtained a judgment on liability, it follows that Remington will obtain a money damage award at the retrial of the assessment proceedings and that this award will be reduced to judgment.

*Id.* at 1273.

Presently before the Court is Remington's motion for summary judgment and damages. It is plaintiff's position that the head start defense[2] is inapplicable to the assessment of damages in this case as a matter of law, and thus would not have affected the damages initially awarded by the Court in this case. Accordingly, plaintiff seeks to reinstate the previous award of damages made by the Court.

BSI's opposition is threefold. First, it contends that reinstatement of the earlier damages award by way of a summary judgment proceeding, rather than a full retrial, is contrary to the clear mandate of the Third Circuit. Secondly, because the granting of summary judgment would be contrary to the express intentions of the Third Circuit, this result would not be entitled to international comity, which is essential in the instant action. Lastly, BSI asserts that summary judgment should be denied because plaintiff cannot establish that it is entitled to judgment on the application of the head start limitation as a matter of law and genuine issues of material fact exist as to the calculation and amount of damages awarded in this action. Defendants claim they are entitled to attack plaintiff's evidence on the calculation and amount of damages "by cross-examination, by presenting contrary evidence and by impeaching the veracity of plaintiff's evidence." Def. Brief at 4. In addition, defendants seek to present evidence in sup-

---

**1.** Except where the distinction is necessary, the Court will refer jointly to BSI, B.V. and BSI, U.S. as "BSI."

**2.** The application of the head start or lead time valuation approach would limit damages to that

period of time in which others in the trade, the defendant in particular, are likely through legitimate business procedures to have become aware of these secrets, if at all.

port of various other legal defenses to the award of damages including: "scope of the secrets; the *de minimus* value of the secrets based on a proper allocation of the royalty under the 1979 License Agreement; Defendants' discontinued use of the secrets; Plaintiff's contribution to the damages of which it complains; Plaintiff's abandonment of the secrets; Defendants repeated offers to place the know-how documents at Plaintiff's disposal; Plaintiff's failure to mitigate damages; and the appropriate measure of damages under the foregoing." [3] Def. Brief at 5.

The Court notes at the outset that the only facts cited and relied upon in reaching its decision herein are those which were tried, proven and determined at earlier stages in this case.

## DISCUSSION

This Court does not find the instant proceeding to be contrary to either the mandate of the Third Circuit or to international principles of comity. Rather, it is appropriate for this Court to determine, in the context of a summary judgment proceeding, whether under New Jersey law [4] the lead time valuation limitation is applicable to an award of monetary damages for trade secret misappropriation and, if so, whether genuine issues of material fact exist to preclude this Court from granting summary judgment on damages. [5]

This Court's inquiry must begin with a review of the applicable New Jersey case law. Plaintiff contends the Court must grant summary judgment in its favor based on the Supreme Court of New Jersey's decision in *Adolph Gottscho, Inc. v. American Marking Corporation*, 18 N.J. 467, 114 A.2d 438, *cert. denied*, 350 U.S. 834, 76 S.Ct. 69, 100 L.Ed. 744 (1955). The issue presented in *Gottscho*, which is pertinent to the instant case, was whether a cause of action for misappropriation of trade secrets is extinguished by a subsequent disclosure of these secrets by issuance to the plaintiff of protective patents during pendency of the misappropriation action. There was no dispute in that case that although the trade secrets were subsequently disclosed in several patents issued to the plaintiff, defendants did not learn the proprietary information from those patents, but learned them in confidence while in the plaintiff's employ and improperly disclosed and used them before the patents were issued. The Supreme Court of New Jersey held that the publication of plaintiff's secret in patents issued after the defendants' misappropriation did not deprive plaintiff of its pre-existing cause of action or its right to complete injunctive and monetary relief against the wrongdoer. 18 N.J. at 475, 114 A.2d 438.

In reaching its decision, the Court in *Gottscho* relied on *Franke v. Wiltschek*, 209 F.2d 493, 495 (2d Cir.1953), and *Julius Hyman & Co. v. Velsicol Corp.*, 123 Colo. 563, 233 P.2d 977 *cert. denied*, 342 U.S. 870, 72 S.Ct. 113, 96 L.Ed. 654 (1951), which focused on the need for enforcement of commercial morality in fiduciary relationships, (*Franke*, 209 F.2d at 499–500), and the fact that the trade secrets appropriated in those cases were not obtained from pat-

---

**3.** In a supplement to its opposition to the present motion, BSI submitted to the Court a copy of a "Stipulation and Order with Respect to Accounts Receivable", in which Remington released certain Dutch banks "their successors and assigns" as part of Remington U.S.'s bankruptcy proceeding "from all claims and causes of action whatsoever which the debtors, their successors and assigns ever had, now have, or hereinafter may have against the Dutch banks ...". Defendants now claim they may utilize this release as "successors or assigns" of the banks. Remington objects to this proffer as untimely and outside the scope of the Third Circuit remand, which it asserts is limited to the head start defense only. The fact that this release was known to defendants' counsel during the earlier proceedings in this case raises the issue of waiver.

**4.** Trade secret claims brought in federal court are governed by state law. *Rohm & Haas Co. v. Adco Chemical Co.*, 689 F.2d 424, 429 (3d Cir. 1982). Both parties agree that New Jersey law governs the present action.

**5.** Unlike many other trade secret misappropriation cases, a permanent injunction was not issued in the instant action. Had an injunction issued, the Court would not be confronted with the present dispute because an accounting period ends at the time of entry of an injunction which would prevent the defendant from profiting further from the misappropriation.

ents subsequently issued but from a prior confidential relationship. (*Hyman,* 233 P.2d at 999). *Gottscho,* 18 N.J. at 473–74, 114 A.2d 438. The *Gottscho* court expressed the rationale underlying its decision as follows:

> [Defendant's] conduct was grossly improper and gave rise to the plaintiff's cause of action, based on long-settled equitable principles and supported by the marked changes in the attitude of the law towards the need for commercial morality. "[T]he tendency of the law, both legislative and common, has been in the direction of enforcing increasingly higher standards of fairness or commercial morality in trade." We know of no persuasive reason for depriving the plaintiff of the benefits of its accrued cause of action.... Surely the defendants are in no just position to seek this result....

*Id.* at 475, 114 A.2d 438 (citations omitted).

This Court finds persuasive the rationale in *Gottscho* that, regardless of whether the trade secrets were ultimately made public via the issuance of a patent or otherwise, defendant obtained the information by misappropriation and not from the public disclosure or any other legitimate business means. In this Court's mind, there is no distinction between the presence of a disclosure which may destroy secrecy, as was addressed in *Gottscho,* and the head start concept, for the former is merely an element of the latter.

The Court is cognizant, however, that while damages were awarded in *Gottscho,* the head start rule was only addressed in the context of its applicability to injunctive relief. This Court's research has failed to uncover any case in which the New Jersey courts have expressly considered the lead time valuation concept as a limitation on damages in a trade secret case. Defendants do draw the Court's attention to a New Jersey appellate court decision in an action by an employer against a former employee based on a restrictive covenant in an employment contract in which the length of injunctive relief granted was limited to "a period equal to the time that would be required for the former employees independently to develop the same process." *Raven v. A. Klein & Co.,* 195 N.J. Super. 209, 216, 478 A.2d 1208 (App.Div. 1984). The *Raven* case is distinguishable from the instant action in one very crucial way, it was based on a restrictive covenant which provided an employer with trade secret protection. The New Jersey courts have historically enforced such covenants to the extent they are reasonable as to time, area and scope of activity. *See Solari Industries, Inc. v. Malady,* 55 N.J. 571, 585, 264 A.2d 53 (1970). Thus, any limitation on the injunction granted in *Raven* was clearly in response to the limitations placed on the enforcement of restrictive covenants under New Jersey law and not due to the application of the head start defense.[6]

**6.** This Court also rejects the argument proffered by the defendants that support for the application of the head start defense to monetary damages in a trade secret case under New Jersey law can be gleaned from the decisions in *Rohm & Haas Co. v. Adco Chemical Co.,* 689 F.2d 424 (3d Cir.1982), and *Reinforced Molding Corp. v. General Electric Co.,* 592 F.Supp. 1083 (W.D. Pa.1984). The defendants' analysis begins by referring to the decision in *Rohm & Hass Co. v. Adco Chemical Co.,* where the Third Circuit's examination of the law of trade secrets in Pennsylvania and New Jersey revealed that application of the law of each state, *as applied to that case,* lead to the same result. 689 F.2d at 429. As to the nature of relief available, the court of appeals held that "both New Jersey and Pennsylvania permit the recovery of defendants' profits or plaintiff's damages resulting from defendants' wrongs". *Id.* at 433–34. The court further held that this relief was not limited or terminat-

ed by a foreign patent issued after defendants' disclosure, citing *Gottscho* and noting that no Pennsylvania cases dealing with this contention could be found. 689 F.2d at 434 n. 13.

Assuming, based on *Rohm & Haas* that New Jersey and Pennsylvania law are the same on all elements of damages recoverable in a trade secret case, defendants suggest this Court should look to and rely on the decision in *Reinforced Molding Corp.,* in which the district court, applying Pennsylvania law, found that defendant misappropriated plaintiff's trade secret and awarded damages, including an accounting of profits restricted to the head start period. 592 F.Supp. at 1084, 1088. The Court rejects this argument because the court in *Reinforced Molding* applied Pennsylvania law and the decision in *Rohm & Haas* contrary to defendants' contention, does not hold that all aspects of the law of damages in a trade secret action are identical under Pennsylvania and New Jersey law.

The Court does agree with the statement made by defendants' counsel at oral argument that "the cases in this area all turn very narrowly on particular facts and circumstances, and each case does entail unique circumstances that have to be considered in each situation." Tr. _____. The instant case is itself unusual for several reasons. First, unlike most of the cases cited to the Court, injunctive relief has never been granted to Remington. The plaintiff's request for preliminary injunctive relief was denied by Judge Hill based in part on the testimony, later found to be false, of one of defendant BSI B.V.'s principals that he had no knowledge that BSI B.V. took Remington's know-how in derogation of its rights. *See Remington Rand Corp. v. Business Systems Inc. (In re Remington Rand Corp.),* Adv. No. 81–928, slip op. at 38–39, 71–72 (Bankr.D.N.J. Sept. 4, 1982). By the time Remington was in a position to seek permanent injunctive relief, that is, when in its Opinion After Final Hearing the bankruptcy court concluded that Khatib and BSI knew of the licensing agreement and elected to consummate the deal with the Dutch trustees anyway, thus making BSI liable to Remington for misappropriation of trade secrets, too much time had passed and too many events had occurred to turn back the clocks. *See Remington Rand Corp. v. Business Systems Inc. (In re Remington Rand Corp.),* Adv. No. 81–928, slip op. at 17, 28–29 (Bankr.D.N.J. Jan. 23, 1984). In addition to the number of years which passed and compromised the appropriateness of an entry of a permanent injunction, the Court also considered the strong public policy against not shutting down an operative Dutch company. In his Opinion Respecting Equitable Relief, Judge Hill remarked:

> Since we are dealing with equitable relief, it seems appropriate to take into account the real peculiarities of this case. To attempt to deprive BSI of the trade

secrets when that result would never have realistically occurred[7] does not comport with the principle that an injunction should be framed and molded to the facts of a particular case. The Court is further convinced that this proposal is inappropriate because it has no demonstrable benefit to the plaintiff, who is no longer in the electromechanical typewriter business.

*Remington Rand Corp. v. Business Systems, Inc. (In re Remington Rand Corp.),* Adv. No. 81–928, slip op. at 8 (Bankr.D.N.J. May 8, 1984). Although BSI would be allowed to continue to produce and sell electromechanical typewriters, the Court made clear that that finding did not in any sense suggest that Remington was not entitled to damages. *Id.* Judge Hill's decision was affirmed by this Court, noting that a "permanent injunction against the BSI defendants use of the trade secret and copyrighted know-how should not issue under the particular and unique circumstances of this case, which do not fit into any customary pattern of trade secret infringement."[8] *Remington Rand Corp. v. Business Systems Inc.,* No. 84–261, slip op. at 101 (D.N.J. Sept. 6, 1984). Thus, in the instant action, equitable principles dictated that an operative Dutch company under the supervision of the Dutch courts not be put out of business, but that the more appropriate course would be for the court to fashion an adequate and complete monetary remedy.

In fashioning an adequate monetary remedy, the court must consider that defendants did not merely wrongly obtain and use plaintiff's know-how as a competitor in the marketing of electromechanical typewriters, they refused to return the know-how to Remington when ordered to do so, thereby completely precluding Remington from also manufacturing electromechanical typewriters. In many ways this situation is analogous to that presented in

---

**7.** The bankruptcy court concluded that BSI would not have been deprived of Remington's trade secrets because a Dutch court under Dutch law would have permitted the Dutch trustees to assume the 1979 license agreement between Remington–U.S. and Remington–B.V., and to sublicense the know-how.

**8.** Both Judge Hill and this Court's decisions on liability and equity were issued after BSI, B.V. had entered suspension of payments proceedings in the Netherlands but while it was still carrying on business as a going concern.

*Molinaro v. Burnbaum,* 201 U.S.P.Q. (BNA) 150, 163 (D.Mass.1978). The court in *Molinaro* held:

> The award for damages compensates the plaintiff for the headstart that the defendants obtained through its misappropriation. In the present situation this headstart amounted to a pre-emption of the entire market and prevented the plaintiff from licensing others, as well as making entry into the market by the plaintiff impossible.
>
> Because the defendants' headstart advantage precluded the plaintiff from licensing others and precluded him from entering the market individually, the defendants' headstart advantage continued until they discontinued sales of Item 490 sometime during 1977. Consequently, plaintiff's damages continued until that date.

201 U.S.P.Q. at 163 (citations omitted). The present facts, however, are even more egregious than in *Molinaro*. Not only was plaintiff precluded from entering the market, it was denied and continues to be denied possession of the know-how documents despite the Orders of this Court.

■ The Court agrees with Remington when it states that application of *Molinaro* to the present case does not dictate that damages continue only until defendants discontinued the manufacture and sale of electromechanical typewriters, since the know-how has never been returned to Remington.[9] Under the particular facts and circumstances of this case, only full and complete monetary relief will adequately compensate plaintiff for the injury caused

by defendants' knowing misappropriation of Remington's trade secret. Reviewing these unusual facts and circumstances in light of the Supreme Court of New Jersey's decision in *Gottscho,* the Court concludes that there is no question that defendants' conduct was grossly improper and that under the teachings of *Gottscho,* plaintiff's monetary recovery should not be limited by a lead time valuation. Regardless of when defendants might have been able to develop the secret process for manufacturing an electromechanical typewriter by legitimate business means, defendants did not learn the proprietary information from legitimate business means such as reverse engineering or independent research, but learned them from its knowing misappropriation of plaintiff's trade secrets. Accordingly, the Court determines as a matter of law that head start is not available to these defendants on the facts in this case.

■ This result is not altered by the myriad of new defenses asserted by defendants to the award of damages in this action. The advancing of these defenses at this late time raises questions of waiver and *res judicata.*[10] Waiver is a voluntary and intentional relinquishment of a known right. 5 S. Williston & W. Jaeger, *A Treatise on the Law of Contracts* § 678 at 239 (3d ed. 1961 & Supp.1987). A defendant's decision not to raise a defense in the trial of a particular action is a waiver of that defense, which waiver is granted *res judicata* effect.

---

**9.** To the extent that *Molinaro* might still be considered to support an argument that the period of plaintiff's damages should terminate as of the date when BSI stopped marketing electromechanical typewriters, it does not purport to represent New Jersey law and this Court declines to follow it.

**10.** The Court feels it necessary to distinguish the principle of waiver invoked here from the doctrines of equitable estoppel and *res judicata.* Equitable estoppel is applied to "estop a party from denying a state of facts which he has previously asserted to be true if the party to whom the representation was made has acted in reliance on the representation and will be prejudiced by its repudiation." 1B J. Moore, J. Lucas

& T. Currier, *Moore's Federal Practice* ¶ .405[8], 239 (2d ed. 1984 & supp. 1987). Equitable estoppel is based upon representation, reliance and prejudice. The principles of *res judicata* dictate that a defendant must assert every available defense in a single lawsuit. "The proposition that the original judgment is conclusive of all defenses that the defendant might have asserted, as well as those that were actually put forward, is the mirror image of the *res judicata* rule that applies to the plaintiff." J. Friedenthal, M. Kane and A. Miller, *Civil Procedure* § 14.6 at 638 (1985). Thus, under the rules of *res judicata,* a defendant is barred from raising any unused defense that was available at earlier proceedings. *Id.* at 639.

Waiver of defenses in a federal action is generally governed by the Federal Rules of Civil Procedure. It is evident from a reading of the Rules that all affirmative defenses and denials must be pleaded or, when appropriate, raised by motion under Rule 12(b), or they will be waived. Fed.R.Civ.P. 8(c) [Affirmative Defenses], 8(d) [Effect of Failure to Deny], and 12(b) [Defenses and Objections—How Presented]. While Rules 12(g) [Consolidation of Defenses in Motion] and 12(h) [Waiver or Presentation of Certain Defenses] serve as the waiver mechanism for Rule 12(b) motions, they have also been found to control any other pretrial motion brought under 12(b) by analogy. *See* 5 C. Wright & A. Miller, *Federal Practice & Procedure* § 1394 at 869 (1969 & Supp.1987).

 A party may avoid waiver by timely seeking leave from the court to interpose an affirmative defense that has been omitted. Fed.R.Civ.P. 15(a). A defense not expressly included in the answer may be considered as having been properly pleaded if it was tried by the express or implied consent of the parties and the court may permit an amendment to conform the pleadings to the issues actually presented and litigated. Fed.R.Civ.P. 15(b). Nonetheless, it appears as though Rule 15 does not relieve a party from his obligation to assert defenses at some reasonable point in time. "A defense that has not been raised in a pleading, by motion, or at trial, normally will be considered waived and cannot be made the subject of an amendment after judgment or be heard for the first time on appeal." *Federal Practice and Procedure* § 1394 at 872. This waiver practice is not unreasonable or arbitrary for relief can sometimes be obtained under Fed.R.Civ.P. 60(b), where the defendant can in good faith assert mistake, inadvertence, surprise, or excusable neglect. *See* R. Givens, *Manual of Federal Practice,* Vol 1, § 3.43 at 356 (3d ed. 1987), and Fed.R.Civ.P. 60(b)(1), (6).

Although the present factual circumstances (where defendants raise innumerable "defenses" after remand, upon the reconvening of damages proceedings to ad-dress another specific defense) is not governed by any of these rules, the Court finds, by analogy to the principles stated above, that the defendants cannot at this late date assert new defenses which were clearly available to them during the initial damages trial. Only the head start defense was barred at the damages trial, none other. When plaintiff rested at that trial, this Court turned to defendants for the presentation of a defense. Defendants did assert a specific (though unsuccessful) defense. Tr. 4/19/85 at 391–92. Defendants had presented pretrial papers and cross-examined plaintiff's witnesses; and they submitted post-trial papers as well. As this Court stated in announcing its decision on the present motion:

> I do not agree with the defendants' assertion that the striking of the head start defense by the Court, as its contempt sanction, either cast such a pall over the entirety of the damages proceedings or altered them so dramatically that other viable, available defenses (if any) were somehow or other precluded or substantially compromised.

Tr. _____. However, the Court will not preclude defendants from moving to have this judgment modified, set aside or to obtain other relief pursuant to Fed.R.Civ.P. 60(b), or presenting any other comparable argument which can be made within the limitations set down by Fed.R.Civ.P. 11.

For the reasons set forth above, the Court grants plaintiff's motion for summary judgment on the head start defense. Plaintiff having proved its case at the damages trial, and there being no defenses now available to defendants, the Court once again enters judgment upon its original damages award, as amended, in the sum of $221,409,481.00. Post-judgment interest will run from the present date only. Taxable costs in this Court are also allowed to plaintiff.